UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 5:22cr60-KDB |
| | ) | |
| v. | ) | **BILL OF INDICTMENT** |
| | ) | |
| (1) MICHAEL ELLIOT KOHN | ) | Violations: 18 U.S.C. § 371 |
| (2) CATHERINE ELIZABETH CHOLLET | ) | 26 U.S.C. § 7206(2) |
| a/k/a "Liza Chollet" | ) | 26 U.S.C. § 7206(1) |
| (3) DAVID SHANE SIMMONS | ) | 18 U.S.C. § 1343 |
| a/k/a "Shane Simmons" | ) | |

**THE GRAND JURY CHARGES:**

At all times material to the Indictment:

**<u>Introduction</u>**

1.      From in or about January 2011 to the date of this Indictment, the defendants, MICHAEL ELLIOT KOHN ("KOHN"), CATHERINE ELIZABETH CHOLLET ("CHOLLET"), a/k/a "Liza Chollet," and DAVID SHANE SIMMONS ("SIMMONS"), a/k/a "Shane Simmons" ("the defendants") engaged in a scheme to defraud the United States by promoting, marketing, and selling to clients a fraudulent tax scheme known as the Gain Elimination Plan ("GEP").

2.      The GEP was designed to conceal clients' taxable income from the Internal Revenue Service ("IRS") by fraudulently inflating business expenses through fictitious royalties and management fees. These fictitious royalties and management fees were, on paper, "paid" to a limited partnership that was owned mostly by a charitable organization. In reality, KOHN and CHOLLET fabricated the fictitious royalties and management fees out of whole cloth. Using these fictitious deductions, KOHN, CHOLLET, and SIMMONS prepared and caused to be prepared false tax returns for their clients. Through this conduct, the defendants caused a loss of tens of millions of dollars to the United States Treasury in the form of unpaid taxes.

3.      KOHN, CHOLLET, and SIMMONS promoted, marketed, and sold the GEP to clients in locations throughout the country, including but not limited to: North Carolina, Missouri, California, Minnesota, Illinois, Texas, and Oklahoma.

4.      From in or about January 2011 to the date of this Indictment, KOHN and SIMMONS engaged in a scheme to defraud an insurance company ("Insurance Company 1"). KOHN and SIMMONS provided false information to Insurance Company 1, including false

1

representations concerning the clients' financials and the purpose of the insurance, to facilitate the issuance of insurance policies. In total, KOHN and SIMMONS caused Insurance Company 1 to issue more than $200 million in insurance policies. SIMMONS earned large commissions for selling the insurance policies, many of which he split with KOHN, CHOLLET, and their law firm.

## Relevant Individuals and Entities

5.     The Kohn Partnership, LLP ("TKP"), was a law firm in St. Louis, Missouri. TKP provided clients with legal and tax return preparation services. TKP employed attorneys, accountants, and other support staff.

6.     KOHN was a resident of St. Louis, Missouri. KOHN was a founding member and partner at TKP. KOHN graduated from St. Louis University School of Law in 1979 and received his Master of Laws Degree in Taxation in 1980 from New York University ("NYU") School of Law.

7.     CHOLLET was a resident of St. Louis, Missouri. CHOLLET graduated from St. Louis University School of Law in 2010 and obtained her Master of Laws Degree in Taxation in 2013 from Washington University in St. Louis. CHOLLET was initially an associate attorney at TKP and later became a junior partner. CHOLLET used the GEP personally and had her wages from TKP paid to an entity, Chollet & Associates, LLP, instead of directly to herself.

8.     SIMMONS was a resident of Jefferson, North Carolina, in Ashe County, within the Western District of North Carolina. SIMMONS was a licensed insurance agent and broker who owned and operated his own insurance business in Jefferson.

9.     Charitable Organization 1 was a charity located in Columbus, Ohio that was tax-exempt under the Internal Revenue Code. Its stated mission was "to assist disadvantaged families and individuals either by working through established charities, or by undertaking direct assistance projects, whichever may be most efficient and cost effective under the circumstances."

10.     Insurance Company 1 was a holding company that operated multiple insurance and investment management businesses through subsidiary companies. Its principal executive offices were in Pennsylvania, though it also had an office in Greensboro, North Carolina.

## Relevant Tax Concepts

11.     The Internal Revenue Service ("IRS") was an agency of the United States Department of the Treasury responsible for enforcing and administering the federal tax laws of the United States and collecting taxes owed to the United States.

12.     An IRS Form 1040, U.S. Individual Income Tax Return ("Form 1040"), was a form used by U.S. taxpayers to report income, gains, losses, deductions, credits, and taxes that

2

occurred during the tax year. A Form 1040X, Amended U.S. Individual Income Tax Return ("Form 1040X"), was a form used to amend a previously-filed federal income tax return.

13. Under the Internal Revenue Code and associated regulations, the term "partnership" included a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is operated. A partnership was an association of two or more persons to carry on as co-owners of a business for profit. The association had to be voluntary and had to be based on an agreement between the parties. A partnership must be organized to conduct a trade or business and will not be recognized if its sole purpose was tax avoidance.

14. A partnership was referred to as a "pass-through" entity because it was not liable for income tax. Instead, its income passes through to the partners who were then proportionally liable for the reported income, losses, deductions, and credits. Partners were required to report the partnership income or losses on their own Forms 1040 and pay the taxes due.

15. A limited partnership was a type of partnership that consisted of one or more general partners and one or more limited partners. General partners operated the business and had unlimited liability for the partnership's debts. Limited partners did not participate in the day-to-day operation of the partnership and their liability for partnership debts was limited to their interest in the partnership.

16. An IRS Form 1065, U.S. Return of Partnership Income ("Form 1065"), was an information return filed by partnerships to report information such as income, gains, losses, deductions, and credits. The income or loss incurred by the partnership, along with each partner's capital contributed during the year, was reported to each partner on a Schedule K-1 (Form 1065), Partner's Share of Income, Deductions, Credits, etc. Partnerships must issue the Schedule K-1 to both the IRS and the partners.

17. An IRS Form 1120-S, U.S. Income Tax Return for an S Corporation ("Form 1120S"), was an information return filed by a Subchapter S corporation to report information such as income, gains, losses, deductions, and dividends of S corporation shareholders. An S corporation did not pay tax on its income, but "passed through" any profits or losses to its shareholders. Shareholders were required to report S corporation items on their Form 1040. The income or loss incurred by the corporation was reported to each Shareholder on a Schedule K-1 (Form 1120-S), Shareholder's Share of Income, Deductions, Credits, etc. The corporation must issue the Schedule K-1 to both the IRS and the shareholders.

18. A royalty was a payment for the right to use an asset and does not include payments for services. Payments for the use of trademarks, trade names, service marks, or copyrights are ordinarily classified as royalties and constitute a business expense for the maker of the payment and income to the recipient.

19.     A management fee is an amount paid to a person or company that manages a business, property, or money for another person or organization and constitutes a business expense for the maker of the payment and income to the recipient.

## Gain Elimination Plan Overview

20.     KOHN, CHOLLET, and SIMMONS promoted, marketed, and sold the GEP to clients by touting significant tax savings while also purportedly supporting a charitable cause. Generally, the defendants' scheme was set up as follows:

    a.      KOHN and CHOLLET created at least one limited partnership for the client ("GEP limited partnership"). The GEP limited partnership had no business purpose besides facilitating the fraudulent reduction of taxes.

    b.      KOHN and CHOLLET would cause the client to first transfer on paper nearly all his or her limited partnership interest to a charitable organization. The defendants would generally direct clients to use their favored charitable organization, Charitable Organization 1.   The client purportedly retained 1-2% interest in the GEP limited partnership.

    c.      When KOHN and CHOLLET prepared and caused to be prepared the client's business's tax returns, they deducted fictitious royalties and/or fictitious management fees as expenses that were purportedly paid to the GEP limited partnership. Because the GEP limited partnership was then mostly "owned" by a charitable organization, the organization, as a non-profit, did not pay taxes on the income falsely allocated to it through these fictitious royalties and management fees.

    d.      These fraudulent deductions were completely fabricated and clients continued to operate their businesses as usual. KOHN, CHOLLET, and SIMMONS assured clients that the charitable organization would not actually receive any money annually and that the clients would retain complete control of their businesses and funds.

    e.      KOHN, CHOLLET, and SIMMONS advised clients that the GEP limited partnership was required to obtain life insurance on the life of the clients to cover the income that was allocated to, but never received by, the charitable organization.   The death benefit was directly tied to the anticipated profitability of the clients' businesses and how much of the clients' taxable income the defendants intended to shelter.

    f.      In theory, the charitable organization would be made whole upon the death of the clients. However, KOHN, CHOLLET, and SIMMONS marketed the GEP as having a defined life, such as a ten-year plan. They explained that the clients could then cancel the life insurance and buy out the charitable organization's GEP limited partnership interests for a discounted value.

4

21.     SIMMONS facilitated the purchase of one or more life insurance policies for the clients. In his role as the insurance agent, SIMMONS earned large commissions.

22.     KOHN, CHOLLET, and SIMMONS, prepared, and caused to be prepared, and filed, and caused to be filed, with the IRS various false tax forms for the clients.

23.     The purported overall benefit of the GEP was the illegal avoidance of federal income taxes paid by clients on their income while the clients continued to enjoy full access to their funds. KOHN, CHOLLET, and SIMMONS claimed that the reduction in taxes would be larger than the annual life insurance premiums and the fees paid to TKP by the clients. For some clients, however, the premiums were larger than any reduction in taxes.

### Promoting the GEP and Misrepresentations in Recruiting Clients

24.     To gain the trust and confidence of prospective GEP clients, KOHN and CHOLLET reviewed prior year tax returns and promised to find additional tax benefits.

25.     KOHN often criticized the work of the clients' prior accountants to convince them that they needed TKP's services and to discourage clients from seeking advice from other professionals, claiming they would not understand the GEP.

26.     KOHN misrepresented his educational background to bolster his credentials, including his academic performance at NYU. KOHN also told the clients false and incomplete information about his previous guilty plea in 2002 to endeavoring to obstruct the due administration of the Internal Revenue laws, in violation of 26 U.S.C. § 7212(a).

27.     As a result of his conviction, KOHN was barred from practicing before the IRS and has not been reinstated. Neither KOHN nor CHOLLET disclosed this to their clients.

28.     As part of the scheme, KOHN and CHOLLET promised to provide opinion letters to protect clients from penalties in the event of an IRS audit. In practice, KOHN and CHOLLET often failed to provide these opinion letters or provided the opinion letters after the clients had already entered into the GEP. Additionally, some clients received opinion letters that were inapplicable to the transaction—for example they were written by other law firms, for other clients, and about other transactions.

29.     KOHN falsely told the clients that SIMMONS was the only person who could obtain the insurance products needed for the GEP. Although CHOLLET worked with SIMMONS, she also worked with another insurance agent.

### Undercover Operation

30.     During the investigation, an undercover agent ("UCA 1"), posing as a business owner with clients seeking financial services, contacted SIMMONS.

5

31.     On or about May 30, 2018, UCA 1 and SIMMONS met in-person in Charlotte, North Carolina where SIMMONS pitched the GEP to UCA 1. At the meeting, SIMMONS said that he worked with KOHN on the GEP. SIMMONS described KOHN as aggressive and said "and he is – and most young guys, you know, they're like, you know, you can take me up to where I can see the jail, but just don't take me inside the doors… But that's the way he is. He is super-aggressive."

32.     SIMMONS explained that KOHN would start by asking for UCA 1's prior three years' of tax returns. After review, KOHN would almost always find alleged mistakes on them, amend them, and seek a significant refund for the client.

33.     On or about September 26, 2018, UCA 1 and Undercover Agent 2 ("UCA 2") met with KOHN, SIMMONS, and CHOLLET at TKP. UCA 2 posed as UCA 1's client, a businessperson who owned multiple nail salons in Texas.

34.     KOHN explained that he could significantly lower UCA 2's effective tax rate by structuring his business through a limited partnership that was partially owned by a charitable organization. KOHN explained that the charitable organization would be allocated income each year, but the partnership would not be obligated to distribute any money to the charitable organization.

35.     Because the charitable organization did not receive any money, KOHN told UCA 2 that "in order to give it economic substance we have to be willing to replace the charity's capital account no later than the year after the partnership is liquidated. So, we have to buy life insurance so that if he dies there will be sufficient cash to retire the charity's capital account."

36.     When UCA 2 asked if the income allocated to the charity had to be distributed to it, KOHN said "it doesn't have to go. It gets allocated. It's on paper. You don't transfer cash to the charity. You get the cash."

37.     UCA 1 asked if all the income could be allocated to the charity. KOHN responded "could you put all of it into the charity's hands? Theoretically, yes." KOHN then stated: "pigs get fat and hogs get slaughtered, so be reasonable."

38.     SIMMONS explained that UCA 2 would need to have KOHN communicate with UCA 2's lenders because UCA 2's tax returns would look vastly different if he used the GEP.

39.     When asked about the partnership, SIMMONS said "you don't have to have a second individual. It's just you're partners with yourself."

40.     During the meeting, UCA 1 and UCA 2 were introduced to CHOLLET. CHOLLET and KOHN said that CHOLLET understood the GEP and promoted and implemented it for her own clients.

41.     CHOLLET also said she personally used a GEP, eliminating $50,000 of her income a year through the plan.

42.     On or about March 7, 2019, UCA 1 had a follow-up call with KOHN and SIMMONS.  UCA 1 asked if UCA 2 would have to meet with the charity if he used the GEP. KOHN said "No, we're basically just borrowing their exemption."

43.     When UCA 1 expressed confusion over what money UCA 2 would need to send to the charity, KOHN said "no, that – he'll pay the charity a royalty through the partnership, but the charity picks up the income.  It does not get the cash."

44.     SIMMONS noted that "we've had some people that wanted to try to use their own charities, but, you know, that is kind of muddying the waters a little bit, because they want money like now."

45.     KOHN proposed amending UCA 2's personal and corporate tax returns that UCA 2 had previously provided, promising significant tax refunds.  KOHN requested copies of UCA 2's previous tax returns and profit and loss statements.

46.     Despite not receiving the profit and loss statements, on or about April 15, 2019, KOHN provided amended 2015, 2016, and 2017 tax returns to UCA 2.  KOHN prepared the 2015 amended return and CHOLLET prepared the 2016 and 2017 amended returns.  Each of these prepared tax returns claimed false deductions.  These deductions were false because UCA 2's business could not legitimately claim them and, even if it could, KOHN and CHOLLET could not have properly determined the amounts of the deductions without the profit and loss statements.  In other words, KOHN and CHOLLET fabricated the amounts without any direction from UCA 2.  In total, the false returns claimed more than $100,000 in fraudulent tax refunds.

### Preparation and Filing of False Tax Returns

47.     KOHN, CHOLLET, and SIMMONS used fictitious royalty expenses and fictitious management fees to reduce the clients' taxable income.

48.     KOHN and CHOLLET determined the amount of the fictitious royalty expenses and fictitious management fees based on the taxable income they intended to fraudulently reduce on behalf of the clients.  This was done after the close of the taxable year, in other words, after the fees and expenses should have already been paid but were not, and the amounts were manufactured out of whole cloth.  For example:

a. On or about September 15, 2014, KOHN emailed Clients K.B. and L.B. as well as SIMMONS that "I have Taxable Income down to $332k WITHOUT a management fee… I am about to accrue a $1 Million management fee which will take [the business] to a loss of $660k… If you don't have a Bonding problem Shane with the loss I am going to let them go. Let me know if you need me to show a profit and I can move some of the management fee to [K.B. and L.B.'s] personal return so we show a modest profit."

b. KOHN, in a subsequent email added "I am going to file with the full management fee. If we decide at a later date we don't want that much of a deduction we can always amend."

49. If and when KOHN and CHOLLET created royalty agreements, they often sent the agreements to the clients after the close of the year to support the false deductions they claimed on the tax returns. For example:

a. After the 2016 tax year concluded, on or about August 15, 2017, KOHN emailed royalty agreements to two separate clients, saying "I need you to sign the Royalty Agreement confirming the deductions I am taking in 2016."

c. On or about April 3, 2019, KOHN's assistant emailed two royalty agreements to Client C.S. for signature. Both agreements had an effective date of January 1, 2016.

50. KOHN, CHOLLET, and SIMMONS sometimes advised clients to open bank accounts in the names of the GEP limited partnerships and to move money into these accounts in amounts that matched the fictitious royalties and management fees claimed on the tax returns. Frequently, the opening of bank accounts and the movement of money occurred after the close of the tax year. When clients transferred money into the GEP limited partnership bank account, KOHN, CHOLLET, and other TKP employees advised them that they could immediately transfer the money out. For example:

a. On or about August 15, 2018, Client J.S. wrote an email to CHOLLET with the subject line "Money movement." J.S. asked: "Do I need to move money from that LP account to other account before transferring it to my personal account?" CHOLLET responded: "Move the money then [sic] to your Asset Management Company bank account and then take it out."

b. On or about July 30, 2020, after SIMMONS' office manager confirmed she would help Client G.B. open the accounts, she asked: "When you say move through it. Does it need to sit there or can he move it in and out." A TKP staff accountant responded: "You can move it in and out as fast as you want."

8

51.     Some clients were never advised to open the bank accounts.  For example:

        a.      In a series of emails between Client C.S. and KOHN beginning on or
about December 31, 2012, the last day of the tax year, the following exchange took place:

> C.S.: Michael, I just remembered do I need to transfer money back and
> forth in my accts?  If so can I do it online and which acct. to which acct.?
> KOHN: You move it to the LP account.  On line [sic] is fine.  Move $400k
> if possible.
> C.S.: I don't have an lp acct. set up yet?  Didn't know I was supposed too
> [sic]
> KOHN: Don't worry.  I will take care of everything.
> C.S.: So I don't need to do anything today?
> KOHN: No

        b.      In or about September 2020, a TKP staff accountant emailed Client Y.M.
"did you put any money into this entity in 2019?  This is the gain-elimination entity?"
Y.M. responded: "I was never instructed to last year or in years past."

52.     At times, and unbeknownst to the clients, instead of using fictitious royalties or
management fees, KOHN and CHOLLET fraudulently reduced the clients' income by falsely
listing on a Schedule K-1 the GEP limited partnership or the charitable organization itself as an
owner in the clients' operating businesses.  The fraudulent Schedule K-1 thereby directly
allocated some of the client's business income to the GEP limited partnership or the charitable
organization.  In reality, the charity never become a partner in the client's operating business.
KOHN and CHOLLET did this in some years despite using a fictitious royalty or management
fee in other years.  For example:

        a.      For tax year 2017, KOHN and CHOLLET deducted as a business expense
a fictitious $300,000 royalty from C.S.'s operating business to Client C.S.'s GEP limited
partnership, which was owned 98% by Charitable Organization 1.  For tax year 2019,
KOHN and CHOLLET falsely listed Charitable Organization 1 as a partner in C.S.'s
operating business, directly allocating it 100% of the profit for that year.

53.     Clients sent supporting documentation to KOHN and CHOLLET for the
preparation of their tax returns.  SIMMONS was also involved in tax preparation, as clients often
worked through him and his office to facilitate the preparation of their returns.  KOHN also
requested information from SIMMONS and his office staff related to clients' insurance policies
and their face values for the purpose of preparing tax returns.

54.     Using fictitious royalty expenses, fictitious management fees, and fraudulent
changes in ownership structure, in conjunction with the supporting tax documents provided by

the clients, KOHN, CHOLLET, and SIMMONS prepared and caused to be prepared tax returns, including but not limited to the items listed below:

| | Taxpayer/Client | Tax Year | Tax Forms Prepared and Filed | Royalty, Management Fee, or Ownership Structure |
|---|---|---|---|---|
| a. | M.A and Mi. A. | 2018 | 1120S, 1065, 1040 | Royalty |
| b. | M.A. and Mi. A. | 2019 | 1065, 1040 | Royalty |
| c. | L.B. and K.B. | 2011 | 1065, 1040 | Royalty |
| d. | L.B. and K.B. | 2012 | 1120S, 1065, 1040 | Royalty |
| e. | L.B. and K.B. | 2013 | 1120S, 1065, 1040 | Royalty and Management Fee |
| f. | L.B. and K.B. | 2015 | 1065, 1040 | Ownership Structure |
| g. | L.B. and K.B. | 2016 | 1120S, 1065, 1040 | Royalty |
| h. | G.B. and N.B. | 2017 | 1120S, 1065, 1040 | Royalty |
| i. | G.B. and N.B. | 2018 | 1120S, 1065, 1040 | Royalty |
| j. | G.B. and N.B. | 2019 | 1120S, 1065, 1040 | Royalty |
| k. | R.M. and J.M. | 2015 | 1120S, 1065, 1040 | Royalty |
| l. | D.N. | 2017 | 1120S, 1065, 1040 | Ownership Structure |
| m. | D.N. | 2018 | 1120S, 1065, 1040 | Royalty and Ownership Structure |
| n. | D.N. and M.N. | 2019 | 1120S, 1065, 1040 | Royalty and Ownership Structure |
| o. | D.P. and M.P. | 2015 | 1065, 1040 | Royalty and Ownership Structure |
| p. | D.P. and M.P. | 2016 | 1065, 1040 | Ownership Structure |
| q. | D.P. and M.P. | 2017 | 1065, 1040 | Ownership Structure |
| r. | G.R. and A.R. | 2015 | 1065, 1040 | Royalty and Ownership Structure |
| s. | G.R. and A.R. | 2016 | 1065, 1040 | Ownership Structure |
| t. | G.R. and A.R. | 2017 | 1065, 1040 | Ownership Structure |
| u. | G.R. and A.R. | 2018 | 1065, 1040 | Ownership Structure |
| v. | J.S. and C.S. | 2018 | 1065, 1040 | Royalty and Management Fee |
| w. | J.S. and C.S. | 2019 | 1065, 1040 | Royalty and Management Fee |
| x. | C.S. and S.S. | 2017 | 1065, 1040 | Royalty |
| y. | C.S. and S.S. | 2018 | 1065, 1040 | Ownership Structure |
| z. | C.S. and S.S. | 2019 | 1065, 1040 | Ownership Structure |

55.    KOHN and CHOLLET filed Forms 1065 for their clients' GEP limited partnerships that listed Charitable Organization 1 as an owner. However, Charitable Organization 1 often did not know about the GEP limited partnerships until it received Schedules K-1 reflecting its purported ownership in them, which was frequently long after the end of the respective tax years.

10

56.     Using a fictitious royalty expense, CHOLLET also prepared and caused to be prepared false tax returns for herself.  For the 2015 to 2019 tax years, CHOLLET used her GEP limited partnership, Green Bean Holdings, and Chollet & Associates to fraudulently underreport her income.  For example:

    a.     CHOLLET fraudulently reduced her 2015 taxable income by claiming a fictitious $50,000 royalty expense on Chollet & Associates' Form 1065.  Because Chollet & Associates' income flowed through to CHOLLET's Form 1040, this fictitious royalty expense fraudulently reduced CHOLLET's personal taxable income.  CHOLLET reported a corresponding $50,000 of income on Green Bean Holdings' 2015 Form 1065.

57.     CHOLLET listed Charitable Organization 1 as owning a 98% limited partnership interest in Green Bean Holdings in 2015.  However, Charitable Organization 1 did not know of Green Bean Holdings in 2015.

**False Information Presented to Insurance Company 1 and Sharing Insurance Commissions**

58.     During the insurance application process, KOHN and SIMMONS provided and caused to be provided false information to Insurance Company 1 regarding the purpose of and need for the insurance, false personal and financial information about the applicants, and false information about the ultimate beneficiary of the life insurance policies.  SIMMONS emailed and caused to be emailed the applications and supporting documentation to Insurance Company 1.

59.     KOHN, CHOLLET, and SIMMONS marketed the GEP as having a defined lifespan, such as a ten-year plan.  The defendants told clients that they could buy out the charitable organization and cancel the life insurance after this time period.  SIMMONS did not disclose these anticipated lifespans of the insurance policies to Insurance Company 1.

60.     SIMMONS earned a commission for each policy he sold amounting to approximately 95% of the policy's first year premium.

61.     Despite sharing commissions with KOHN and CHOLLET, SIMMONS falsely represented in his annual compliance forms that he did not share commissions with anyone.

62.     Insurance Company 1 paid SIMMONS commissions by wire.  SIMMONS deposited and caused to be deposited the commissions into a bank account in his name at Lifestore Bank.

63.     After SIMMONS received the commissions, SIMMONS transferred the money to the Simmons Family LP bank accounts located at Fifth Third Bank and LifeStore Bank in Jefferson, North Carolina.

64.     SIMMONS sent approximately 50% of the GEP client commissions to KOHN and CHOLLET by wiring the funds and mailing checks.  SIMMONS labeled many of these payments as "professional services," "professional fees," "tax planning," "return review," and "legal fees."  In total, between 2014 and 2020, SIMMONS paid KOHN and CHOLLET over $1.2 million in commissions.

65.     SIMMONS, KOHN, and CHOLLET communicated by email about payment of the commissions.

# COUNT ONE
## Conspiracy to Defraud the United States
### (18 U.S.C. § 371)

66.    The Grand Jury realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 65 of the Bill of Indictment, and further alleges that:

67.    From in or about January 2011 through in or about the date of this Indictment, within the Western District of North Carolina, and elsewhere, the defendants,

**(1) MICHAEL ELLIOT KOHN**
**(2) CATHERINE ELIZABETH CHOLLET, and**
**(3) DAVID SHANE SIMMONS,**

and individuals known and unknown to the Grand Jury, did unlawfully, voluntarily, intentionally, and knowingly conspire, combine, confederate, and agree together and with each other to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service of the Treasury Department in the ascertainment, computation, assessment, and collection of income taxes.

68.    The manner and means by which the conspiracy was sought to be accomplished included, among other things, the allegations contained in paragraphs 1 through 4 and 20 through 65, of the Bill of Indictment.

69.    In furtherance of the conspiracy, and to effect the objects thereof, the overt acts alleged in paragraphs 1 through 4 and 20 through 65 of the Bill of Indictment, were committed in the Western District of North Carolina and elsewhere.

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO THROUGH TWELVE
### Aiding and Assisting in the Filing of False Tax Returns
### (26 U.S.C. § 7206(2))

70.     The Grand Jury realleges and incorporates by reference herein all the allegations contained in paragraphs 1 through 65 of the Bill of Indictment, and further alleges that:

71.     On or about the dates listed below, within the Western District of North Carolina, and elsewhere, the defendants,

### (1) MICHAEL ELLIOT KOHN,
### (2) CATHERINE ELIZABETH CHOLLET, and
### (3) DAVID SHANE SIMMONS,

did willfully aid and assist in, and procure, counsel, and advise the preparation and presentation to the Internal Revenue Service for the tax years listed below, of the tax returns listed below, along with the accompanying schedules, for the taxpayers and entities listed below which were false and fraudulent as to a material matter.  The tax returns reported false items on the lines and in the amounts listed below, among others, whereas KOHN, CHOLLET, and SIMMONS then and there well knew and believed the amounts on the lines listed below were substantially understated.

| Count | Taxpayer(s) | Tax Return | Approximate Filing Date | False Item | Amount Reported |
|-------|-------------|------------|-------------------------|------------|-----------------|
| 2 | C.S. and S.S. | 2017 Form 1040 | 9/10/2018 | Total income (Line 22) | $175,982 |
| 3 | C.S. and S.S. | 2018 Form 1040 | 09/16/2019 | Total income (Line 22) | $150,838 |
| 4 | C.S. and S.S. | 2019 Form 1040 | 10/01/2020 | Total income (Line 7b) | $228,096 |
| 5 | L.B. and K.B. | 2015 Form 1040 | 02/9/2017 | Total income (Line 22) | -$418,185 |
| 6 | L.B. and K.B. | 2016 Form 1040X | 12/17/2018 | Total income (Line 22) | -$649,512 |
| 7 | G.B. and N.B. | 2017 Form 1040 | 4/30/2020 | Total income (Line 22) | -$4,710 |
| 8 | G.B. and N.B. | 2018 Form 1040 | 5/19/2020 | Total income (Line 6) | $65,591 |
| 9 | G.B. and N.B. | 2019 Form 1040 | 9/22/2021 | Total income (Line 6) | $150,730 |
| 10 | D.N. | 2017 Form 1040 | 02/15/2019 | Total income (Line 6) | $121,770 |
| 11 | D.N. | 2018 Form 1040 | 1/29/2020 | Total income (Line 6) | $104,883 |
| 12 | D.N. and M.N. | 2019 Form 1040 | 10/28/2020 | Total income (Line 7b) | $215,249 |

14

All in violation of Title 26, United States Code, Section 7206(2).

## COUNTS THIRTEEN THROUGH SEVENTEEN
### Filing a False Tax Return
### (26 U.S.C. § 7206(1))

72.     Paragraphs 5 through 19 and 58 through 65 of this Bill of Indictment are re-alleged and incorporated herein by reference as though fully set forth herein.

73.     SIMMONS engaged KOHN and CHOLLET to prepare his individual and business income tax returns. These tax returns underreported business income and overstated business expenses.

74.     To secure and maintain financing for his business and to obtain a residential loan, SIMMONS provided false tax returns and financial information to a financial institution. For example, SIMMONS provided financial institutions with tax returns that were not filed with the IRS and tax returns that did not match the returns that were filed with IRS.

75.     On or about the dates listed below, in the Western District of North Carolina, the defendant,

### (3) DAVID SHANE SIMMONS,

a resident of Jefferson, North Carolina, did willfully make and subscribe and filed and caused to be filed with the Internal Revenue Service, the tax returns for the tax years listed below, each of which were verified by written declarations that they were made under the penalties of perjury and which SIMMONS did not believe to be true and correct as to every material matter. The tax returns reported false items on the lines and in the amounts listed below, among others, whereas SIMMONS then and there well knew and believed the amounts on the lines listed below were substantially understated.

| Count | Tax Return | Approximate Filing Date | False Item(s) | Amount Reported |
|---|---|---|---|---|
| 13 | 2015 Form 1040X | 3/2/2017 | *Attached Form 1040:*<br><br>Total income (Line 22) | <br><br>-$161,475 |
| 14 | 2016 Form 1040 | 11/22/2017 | Total income (Line 22) | $1,205 |
| 15 | 2017 Form 1040 | 12/12/2018 | Total income (Line 22) | -$40,064 |
| 16 | 2018 Form 1040 | 10/18/2019 | Total income (Line 6) | $75,609 |
| 17 | 2019 Form 1040 | 10/15/2020 | Total Income (Line 7b) | $51,203 |

All in violation of Title 26, United States Code, Section 7206(1).

16

## COUNTS EIGHTEEN THROUGH TWENTY-TWO
## Aiding and Assisting in the Filing of False Tax Returns
## (26 U.S.C. § 7206(2))

76. The Grand Jury realleges and incorporates by reference herein all of the allegations contained in paragraphs 5 through 19, 58 through 65, and paragraphs 73 and 74 of the Bill of Indictment, and further alleges that:

77. On or about the dates listed below, within the Western District of North Carolina, and elsewhere, the defendants,

### (1) MICHAEL ELLIOT KOHN
### and
### (2) CATHERINE ELIZABETH CHOLLET,

did willfully aid and assist in, and procure, counsel, and advise the preparation and presentation to the Internal Revenue Service for the tax years listed below, of the IRS tax forms listed below, along with the accompanying schedules, for DAVID SHANE SIMMONS which were false and fraudulent as to a material matter. The tax returns reported false items on the lines and in the amounts listed below, among others, whereas KOHN and CHOLLET, as identified in the specific counts below, then and there well knew and believed the amounts on the lines listed below were substantially understated.

| Count | Defendant(s) | Tax Return | Approximate Filing Date | False Item | Amount Reported |
|-------|-------------|-----------|------------------------|-----------|----------------|
| 18 | KOHN | 2015 Form 1040X | 03/02/2017 | *Attached Form 1040*: Total income (Line 22) | -$161,475 |
| 19 | KOHN | 2016 Form 1040 | 11/22/2017 | Total income (Line 22) | $1,205 |
| 20 | KOHN | 2017 Form 1040 | 12/12/2018 | Total income (Line 22) | -$40,064 |
| 21 | KOHN and CHOLLET | 2018 Form 1040 | 10/18/2019 | Total income (Line 6) | $75,609 |
| 22 | KOHN and CHOLLET | 2019 Form 1040 | 10/15/2020 | Total income (Line 7b) | $51,203 |

All in violation of Title 26, United States Code, Section 7206(2).

17

## COUNT TWENTY-THREE
### Wire Fraud
### (18 U.S.C. § 1343)

78.     The Grand Jury realleges and incorporates by reference herein the allegations contained in paragraphs 4 through 10, 20e, 20f, 21, and 58 through 65 of the Bill of Indictment, and further alleges that:

79.     From at least in or about January 2011 through in or about the date of this Indictment, in Ashe County, within the Western District of North Carolina and elsewhere, the defendants,

### (1) MICHAEL ELLIOT KOHN
### and
### (3) DAVID SHANE SIMMONS,

with the intent to defraud, did knowingly and intentionally devise a scheme and artifice to defraud and obtain money and property from Insurance Company 1 by materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice to defraud, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce any writing, sign, signal, picture, or sound, namely emails and interstate wire transfers associated with the fraudulent scheme.

80.     The manner and means by which KOHN and SIMMONS sought to accomplish the object and purpose of the scheme and artifice to defraud included, among others:

        a.      It was a part of the scheme and artifice to defraud that KOHN and SIMMONS required most clients of the GEP to purchase life insurance through SIMMONS from Insurance Company 1.  The life insurance policies generated large commissions shared by the defendants;

        b.      It was further a part of the scheme and artifice to defraud that in order to obtain life insurance, KOHN and SIMMONS submitted false information to Insurance Company 1 regarding the purpose of and need for the life insurance, false personal and financial information about the applicants, and false information about the ultimate beneficiary of the life insurance policies;

        c.      It was further a part of the scheme and artifice to defraud that SIMMONS did not disclose to Insurance Company 1, including on annual compliance forms, the sharing of commissions with KOHN and CHOLLET;

18

d. It was further a part of the scheme and artifice to defraud that KOHN and SIMMONS corresponded about the details of the scheme with one another, with clients, and with Insurance Company 1, via electronic mail;

e. It was further a part of the scheme and artifice to defraud that KOHN and SIMMONS engaged in and caused wire communications affecting interstate and foreign commerce between the Western District of North Carolina and locations outside of North Carolina, including electronic mail and wire transfers.

All in violation of Title 18, United States Code, Section 1343.

## NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

Notice is hereby given of 18 U.S.C. § 982 and 28 U.S.C. § 2461(c). Under Section 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by Section 981(a)(1)(C). The following property is subject to forfeiture in accordance with Section 982 and/or 2461(c):

a.    All property which constitutes or is derived from proceeds of the violations set forth in Count Twenty-Five (wire fraud); and

b.    If, as set forth in 21 U.S.C. § 853(p), any property described in (a) cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant/s to the extent of the value of the property described in (a).

The Grand Jury finds probable cause to believe that the following property is subject to forfeiture on one or more of the grounds stated above:

a.    A forfeiture money judgment in the amount of at least approximately $3,200,000, such amount constituting the net proceeds of the wire fraud.

A TRUE BILL:

FOREPERSON

DENA J. KING
UNITED STATES ATTORNEY

CARYN FINLEY
ASSISTANT UNITED STATES ATTORNEY

TODD ELLINWOOD
TRIAL ATTORNEY

KEVIN SCHNEIDER
TRIAL ATTORNEY