IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO.: 5:22-cr-60-KDB |
| | ) | |
| v. | ) | **UNITED STATES' CONSOLIDATED** |
| | **)** | **RESPONSE TO DEFENDANTS'** |
| | **)** | **MOTIONS FOR JUDGMENT OF** |
| (1)  MICHAEL E. KOHN | ) | **ACQUITTAL OR IN THE** |
| (2)  CATHERINE E. CHOLLET | ) | **ALTERNATIVE MOTION FOR A** |
| a/k/a Liza Chollet | ) | **NEW TRIAL** |
| (3)  DAVID SHANE SIMMONS | ) | |
| | ) | |

NOW COMES the United States of America, by and through Dena J. King, United States

Attorney for the Western District of North Carolina, and responds to the Defendants' Motions for

Judgment of Acquittal, or, in the Alternative, Motions for New Trial. Docs. 211-213.[1]  The

Defendants jointly argue that the Court should enter a judgment of acquittal because the false line

items charged in all the Title 26 counts of the Indictment were literally true. Defendant Kohn

also argues that the Court erred by refusing to the instruct the jury on a literal truth defense. The

Defendants further jointly argue that the Court improperly constructively amended the Indictment

as to every Title 26 Count. The final joint argument propounded by Defendants Kohn and Chollet

is that the Government failed to prove venue by a preponderance of the evidence for Counts 2

through 12 and Counts 18 through 22.

Kohn further argues that the Court erred in admitting evidence related to his 2002

conviction. Simmons argues that the Government failed to present sufficient evidence to sustain

convictions against him for any Count. Simmons further argues that the Court erred in excluding

certain evidence of his purported reliance on counsel and by failing to give a reliance-on-counsel

---

[1] Defendant Kohn does not ask for a judgment of acquittal for Count 1, but he does ask for a new trial.

instruction to the jury. Chollet argues that the Government improperly shifted its theory during the trial and that the Court made various erroneous evidentiary rulings to her detriment.

The literal truth defense does not apply to this case. As such, the Court properly refused to give a literal truth instruction and should not grant the Defendants' motions for a judgment of acquittal. The Court did not improperly amend the Indictment by addressing typographical errors in the line item references to four Counts. These minor changes did not affect the Defendants' substantial rights and were permissible under Federal Rule of Criminal Procedure 52(a). The Court should also deny the Defendants' motions because there was ample evidence to support the jury's finding of venue by a preponderance of the evidence.

The Court did not err in admitting evidence related to Kohn's previous guilty plea and his subsequent lies about it. The evidence was properly admissible to prove Kohn's knowledge, intent, and lack of mistake. The Court ruled, pretrial, that Simmons could not present a reliance on counsel defense with respect to the conspiracy count and the aiding and assisting the preparation of false tax returns counts because he failed to comply with the Court's Order. Doc. 151. However, he was permitted to present evidence of his reliance on counsel for the preparation of his own personal tax returns, but failed to do so at trial, thereby making a reliance instruction inapplicable. *Id*. Because Simmons did not testify to specifically assert that he relied on the Greenberg Traurig opinion letter, the Court properly excluded it as hearsay. Had Simmons wanted to admit the letter not for its truth, but rather for the effect it had on him, he was free to do so by testifying as such. The Court correctly ruled that Simmons did not meet the burden for his requested reliance instruction. Finally, the Government did not improperly shift its theory during the trial and the Court's evidentiary rulings against Chollet were correct.

2

## LEGAL STANDARD

In ruling on a defendant's motion for acquittal under Rule 29 of the Federal Rules of Criminal Procedure, the Court must view the evidence in the light most favorable to the government and inquire whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). "The Court may not weigh the evidence or review the credibility of witnesses." *United States v. Wilson*, 118 F.3d 228, 234 (4th Cir. 1997). To prevail, a defendant must meet an "imposing burden" that "the record demonstrates a lack of evidence from which a jury could find guilt beyond a reasonable doubt." *United States v. Martin*, 523 F.3d 281, 288 (4th Cir. 2008) (cleaned up).

Rule 33 of the Federal Rules of Criminal Procedure provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." In considering whether to grant a new trial, the Court "should only overturn a jury verdict in the rare circumstance when the verdict is against the great weight of the evidence." *United States v. Garcia*, 855 F.3d 615, 620 (4th Cir. 2017) (internal citation omitted).

## PROCEDURAL BACKGROUND

On November 16, 2022, a federal grand jury in the Western District of North Carolina returned an Indictment against the Defendants, charging them with conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and multiple counts of aiding and assisting in the preparation of false tax returns, in violation of 26 U.S.C. § 7206(2). Doc. 1. The Indictment further charged Simmons with multiple counts of filing materially false tax returns, in violation of 26 U.S.C. § 7206(1). *Id.* The final count of the Indictment charged Kohn and Simmons with

wire fraud, in violation of 18 U.S.C. § 1343, however, the United States moved to dismiss this count which the Court granted on June 5, 2023.  Docs. 60 and 61.

Trial began on April 15, 2024.  The United States presented approximately seven days of evidence, called thirteen witnesses, and introduced well over 1,000 exhibits into evidence. Following the close of the United States' case, on April 23, 2024, the Defendants moved for judgments of acquittal.  Docs. 195, 196, and 197.  The United States responded, and the Court denied their Motions.  Docs. 198 and 206.  The Defendants did not present any evidence and the case went to the jury on April 24, 2024.  The jury returned its verdict on April 25, 2024, finding the Defendants guilty as to every Count in the Indictment.  Doc. 202.  On June 11, 2024, the Defendants filed their Motions for Judgment of Acquittal, or, in the Alternative, a New Trial. Docs. 211, 212, and 213.  Each Defendant adopted and joined in any motion filed by a co-defendant.  *Id*.

## EVIDENCE PRESENTED AT TRIAL

The evidence at trial was more than sufficient to support the jury's verdict as to every Count.  The Defendants' summary arguments to the contrary find no support in either the record or the law, and must therefore, be rejected.

## I.      Overview of the Gain Elimination Plan ("GEP")

The evidence at trial overwhelmingly established that from in or about January 2011 to November 16, 2022, the defendants, Michael Elliot Kohn ("Kohn"), Catherine Elizabeth Chollet ("Chollet"), a/k/a "Liza Chollet," and David Shane Simmons ("Simmons"), a/k/a "Shane Simmons" ("the Defendants") engaged in a scheme to defraud the United States by promoting, marketing, and selling to clients a fraudulent tax scheme known as the GEP.

The GEP was designed to conceal clients' taxable income from the Internal Revenue

Service ("IRS") by fraudulently inflating business expenses through fictitious royalties and management fees. These fictitious royalties and management fees were, on paper, "paid" to a limited partnership that was owned mostly by a charitable organization. In reality, Kohn and Chollet fabricated the fictitious royalties and management fees out of whole cloth. Using these fictitious deductions, Kohn, Chollet, and Simmons prepared and caused to be prepared false tax returns for their clients. Through this conduct, the defendants caused a loss of millions of dollars to the United States Treasury in the form of unpaid taxes.

The Kohn Partnership, LLP ("TKP"), was a law firm in St. Louis, Missouri. TKP provided clients with legal and tax return preparation services. TKP employed attorneys, accountants, and other support staff. Kohn was a founding member and partner at TKP. Chollet was a junior partner. Chollet used the GEP personally and had her wages from TKP paid to an entity, Chollet & Associates, LLP, instead of directly to herself. Simmons was a resident of Jefferson, North Carolina, in Ashe County, within the Western District of North Carolina. Simmons was a licensed insurance agent and broker who owned and operated his own insurance business in Jefferson.

Kohn, Chollet, and Simmons promoted, marketed, and sold the GEP to clients in locations throughout the country, including but not limited to: North Carolina, Missouri, California, Minnesota, Illinois, Texas, and Oklahoma. Many of these clients testified at trial.

The witnesses testified that Kohn, Chollet, and Simmons promoted, marketed, and sold the GEP to clients by touting significant tax savings while also purportedly supporting a charitable cause. Generally, Kohn and Chollet created at least one limited partnership for the client ("GEP limited partnership"). The GEP limited partnership had no business purpose besides facilitating

5

the fraudulent reduction of taxes. Kohn and Chollet would cause the client to first transfer on paper nearly all his or her limited partnership interest to a charitable organization.

International Foundation Corporation ("INFC") was a charity located in Columbus, Ohio that was tax-exempt under the Internal Revenue Code. Richard Ricketts ("Ricketts"), INFC's outside counsel, testified at trial that its stated mission was to assist disadvantaged families and individuals either by working through established charities, or by undertaking direct assistance projects. The Defendants would generally direct clients to use INFC. The client purportedly retained 1-2% interest in the GEP limited partnership.

When Kohn and Chollet prepared and caused to be prepared the client's business's tax returns, they deducted fictitious royalties and/or fictitious management fees as expenses that were purportedly paid to the GEP limited partnership. Because the GEP limited partnership was then mostly "owned" by a charitable organization, the organization, as a non-profit, did not pay taxes on the income falsely allocated to it through these fictitious royalties and management fees.

These fraudulent deductions were completely fabricated, and clients continued to operate their businesses as usual. Kohn, Chollet, and Simmons assured clients that the charitable organization would not actually receive any money annually and that the clients would retain complete control of their businesses and funds.

Kohn, Chollet, and Simmons advised clients that the GEP limited partnership was required to obtain life insurance on the life of the clients to cover the income that was allocated to, but never received by, the charitable organization. The death benefit was directly tied to the anticipated profitability of the clients' businesses and how much of the clients' taxable income the Defendants intended to shelter. In theory, the charitable organization would be made whole upon the death of the clients. However, Kohn, Chollet, and Simmons marketed the GEP as having

6

a defined life, such as a ten-year plan. They explained that the clients could then cancel the life insurance and buy out the charitable organization's GEP limited partnership interests for a discounted value.

Simmons facilitated the purchase of one or more life insurance policies for the clients. Simmons used Lincoln Financial to write most of the insurance policies used in the GEP. In his role as the insurance agent, Simmons earned large commissions, approaching 100% of the first year's premium payment. The purported overall benefit of the GEP was the illegal avoidance of federal income taxes paid by clients on their income while the clients continued to enjoy full access to their funds.

To gain the trust and confidence of prospective GEP clients, Kohn and Chollet reviewed their prior year tax returns and promised to find additional tax benefits. *See i.e.,* Testimony of Gregory Bower, Craig Sullivan, and Undercover Agent. Kohn often criticized the work of the clients' prior accountants to convince them that they needed TKP's services and to discourage clients from seeking advice from other professionals, claiming they would not understand the GEP. For example, in a June 29, 2015, email to clients Matthew and Michelle Alepra, Kohn remarked that "I know I wasn't asked to find you money but that is what usually happens when I look at someone's work." Government Exhibit ("GX") 824. In a follow-up email the next day, with Chollet copied, Kohn said:

> In my opinion many of the errors on the return are classic CPA errors
> – errors a tax lawyer would not make… If I was asked to grade your
> CPA I would have given him a D+ for you [sic] individual returns
> and an F for the Corporate returns.

*Id*.

On December 28, 2011, Kohn responded to Craig Sullivan ("Sullivan") who had concerns that the plan "seems too good to be true!" Kohn stated:

> You are not a tax lawyer.  You will never get 'comfortable' with doing something that is outside just paying your taxes.  You can't ask your local accountant or local lawyer because there is no way in HELL they could possibly know how it works.

GX 889 (emphasis in original).  When Sullivan later asked, "to set up a time that I can have my current accountant talk with Michael just to ease my nerves a little and get his opinion," Kohn responded on May 29, 2012:

> I thought I was replacing this guy?... I have many many clients who have implemented the plan.  In all such cases, I have become the client's tax lawyer/accountant so that the client doesn't pay twice to get his work done.  If you recall, I told you there were errors in your prior returns which indicate to me that you shouldn't be using this accountant whether you had implemented the plan or not.

GX 891.

When Damian Novak's ("Novak") accountant asked Kohn some questions, Kohn responded on April 21, 2016:

> I really do not want to get into a detailed discussion trying to prove to you all what mistakes you made.  In my experience, what happens is that I point out the mistakes, you will ultimately agree and then offer to make all of my proposed changes and then I am out of the work and I have nothing to show for my week's work.

GX 937.

## II.     Undercover Operation

During the investigation, an undercover agent ("UCA 1"), posing as a business owner with clients seeking financial services, contacted Simmons.  On May 30, 2018, UCA 1 and Simmons met in-person in Charlotte, North Carolina, where Simmons pitched the GEP.  GX 1485A – GX 1485H.  At the meeting, Simmons stated that he worked with Kohn on the GEP.  Simmons described Kohn as aggressive explaining:

> . . . and he is – and most young guys, you know, they're like, you know, you can take me up to where I can see the jail, but just don't

> take me inside the doors… But that's the way he is.  He is super-
> aggressive.

Simmons explained that Kohn would start by asking for UCA 1's prior three years of tax returns. After review, Kohn would almost always find alleged mistakes on them, amend them, and seek a significant refund for the client.

On June 14, 2018, UCA 1 spoke to Simmons and Kohn on a conference call.  GX 1486A – GX 1486E.  Kohn explained that he could provide significant tax savings' strategies to UCA 1's clients.  Kohn said that he would provide an opinion letter that would protect UCA 1's client in the event of an IRS audit.  Kohn said that people assume life insurance premiums are not tax deductible and explained that they could be deductible but "you just have to make the premiums something other than what they were originally."

On September 26, 2018, UCA 1 and Undercover Agent 2 ("UCA 2") met with Kohn, Simmons, and Chollet at TKP.  UCA 2 posed as UCA 1's client, a businessperson who owned multiple nail salons in Texas.  GX 1488A – 1488E and GX 1489A – GX 1489D.  Kohn explained that he could significantly lower UCA 2's effective tax rate by structuring his business through a limited partnership that was partially owned by a charitable organization.  Kohn explained that the charitable organization would be allocated income each year, but the partnership would not be obligated to distribute any money to the charitable organization.

Because the charitable organization did not receive any money, Kohn told UCA 2 that:

> in order to give it economic substance we have to be willing to
> replace the charity's capital account no later than the year after the
> partnership is liquidated.  So, we have to buy life insurance so that
> if he dies there will be sufficient cash to retire the charity's capital
> account.

When UCA 2 asked if the income allocated to the charity had to be distributed to it, Kohn said "it doesn't have to go.  It gets allocated.  It's on paper.  You don't transfer cash to the charity.

You get the cash."   UCA 1 asked if all the income could be allocated to the charity.   Kohn responded "could you put all of it into the charity's hands?  Theoretically, yes." Kohn then stated: "pigs get fat and hogs get slaughtered, so be reasonable."

Simmons explained that UCA 2 would need to have Kohn communicate with UCA 2's lenders because UCA 2's tax returns would look vastly different if he used the GEP.  GX 1488B. Kohn explained to UCA 1 and UCA 2 that he had a criminal history.  He said that the IRS investigated him because he would not violate the attorney-client privilege and give them his clients' files.  Kohn said that he pleaded guilty to obstruction of justice.  However, according to Kohn, the plea agreement he signed did not constitute a crime and that the statute describing the offense had since been held unconstitutional.  Kohn explained that "it wasn't difficult for me to get my license back because the Bar said we know you got shafted, come on in."

UCA 1 asked Kohn "do you review all your guy's work?"  Kohn said, "I do."  UCA 1 said "and then your wife will review your work, right?"  Kohn said, "actually my daughter, my daughter may, she does it."  When asked about the GEP partnership, Simmons said "you don't have to have a second individual.  It's just you're partners with yourself."

Simmons discussed the timeframe of the plan.  The following conversation ensued:

> Simmons: One thing I was going to mention before we pause.  Typically, if you were to go through that process –
>
> UCA 1: The charity thing?
>
> Simmons: basically, it's like a, it's basically like a 10 lifespan.  Right?
>
> Kohn: What, the plan?
>
> Simmons: Yeah
>
> Kohn: Yeah

Simmons: So, like if you were to – if you were to be thinking about trying to eliminate – do this game of eliminate or eliminate income, you've got to think of it in not that you're going to do a million for this year. It's like you're trying to project what you might do over the next ten years because that's kind of – what is the statute of limitations?

Kohn: Six years plus.

During the meeting, UCA 1 and UCA 2 were introduced to Chollet. Chollet and Kohn said that Chollet understood the GEP and promoted and implemented it for her own clients.

UCA 1: So, let me ask the loaded work question though. So, when you retire are you going to take over then?

Kohn: She's taking over.

Chollet: I already took over.

UCA 1: Good. That's a good answer.

Kohn: At least she's honest about it.

UCA 1: I like it. So, we'll be able to speak. So, you understand all this stuff with the tax part and the charity and all that?

Simmons: We just did one – she took over one of the clients in California, San Diego. She and I met with them, I guess, about three months ago now.

Kohn: Now he won't talk to me anymore.

UCA 1: Well, you knew where I was going. You already knew it.

Chollet: Well, I've been practicing for seven years, so yeah.

UCA 1 asked about their success with the IRS. Chollet stated that "We just, um – again, I don't want to jinx myself, but um, we've been fortunate. I mean, there's nothing really about

11

any of our plans that – the IRS never really comes in and has a global look at what you're doing." Chollet later said that "they're [the IRS] never going to see the moving pieces of the plan as a whole between different taxpayers." Chollet also said she personally used a GEP, eliminating $50,000 of her income a year through the plan.

On March 7, 2019, UCA 1 had a follow-up call with Kohn and Simmons. GX 1487A – GX 1487K. UCA 1 asked if UCA 2 would have to meet with the charity if he used the GEP. Kohn said "No, we're basically just borrowing their exemption." When UCA 1 expressed confusion over what money UCA 2 would need to send to the charity, Kohn said "no, that – he'll pay the charity a royalty through the partnership, but the charity picks up the income. It does not get the cash." Simmons noted that "we've had some people that wanted to try to use their own charities, but, you know, that is kind of muddying the waters a little bit, because they want money like now."

UCA 1 asked how Kohn and Simmons determine the amount of insurance to apply for. Kohn replied: "it's determined by how much he plans – that he wants to save." UCA 1 responded: "Got you. So whatever amount of tax savings and then you help him come up with that amount?" Simmons responded: "Yeah, yeah, yeah. Yes. So, under that scenario, if he's making – let's just say he's making a million a year. Does he want to eliminate all of that, or does he want to do some of that or whatever?" UCA 1 then asked how much Kohn recommended eliminating if UCA 2 made $1 million. In a laughing response, Kohn said "a million."

Kohn proposed amending UCA 2's personal and corporate tax returns that UCA 2 had previously provided, promising significant tax refunds. GX 1489A - GX 1487C, GX 1484. Kohn requested copies of UCA 2's previous tax returns and profit and loss statements. *Id*. Despite not receiving the profit and loss statements, on April 15, 2019, Kohn provided amended 2015, 2016,

and 2017 tax returns to UCA 2. GX 1471, GX1473 – GX 1476. Kohn prepared the 2015 amended return and Chollet prepared the 2016 and 2017 amended returns. Each of these prepared tax returns claimed false deductions. *Id*. These deductions were false because UCA 2's business could not legitimately claim them. The deductions were for domestic manufacturing and production companies, but UCA 2's businesses were nail salons, i.e., service businesses.

## III. Royalties

Kohn, Chollet, and Simmons used fictitious royalty expenses and fictitious management fees to reduce the clients' taxable income. Kohn and Chollet determined the amount of the fictitious royalty expenses and fictitious management fees based on the taxable income they intended to fraudulently reduce on behalf of the clients. This was done after the close of the taxable year, in other words, after the fees and expenses should have already been paid, but were not, and the amounts were manufactured out of whole cloth.

For example, on September 15, 2014, Kohn emailed clients Larry and Karen Bare as well as Simmons that:

> I have Taxable Income down to $332k WITHOUT a management fee… I am about to accrue a $1 Million management fee which will take [the business] to a loss of $660k… If you don't have a Bonding problem Shane with the loss I am going to let them go. Let me know if you need me to show a profit and I can move some of the management fee to Karen and Larry's personal return so we show a modest profit.

GX 876 (emphasis in original). Kohn, in a subsequent email added "I am going to file with the full management fee. If we decide at a later date we don't want that much of a deduction we can always amend." *Id*.

If and when Kohn and Chollet created royalty agreements, they often sent the agreements to the clients after the close of the year to support the false deductions they claimed on the clients'

tax returns. For example, after the 2016 tax year concluded, on or about August 15, 2017, Kohn emailed royalty agreements to two separate clients, saying "I need you to sign the Royalty Agreement confirming the deductions I am taking in 2016." GX 1429. As another example, on March 15, 2019, Kohn sent another client, Sullivan, two royalty agreements to sign. The royalty agreements were dated with effective dates of January 1, 2016, more than three years earlier. GX 923, 924, 925, 926.

On or about November 15, 2019, Gabriel Brennan ("Brennan"), a TKP employee, drafted amended tax returns for Novak and provided them to Kohn and Chollet. Brennan noted that "they were amended to include a $750,000 royalty expenses." Despite having already prepared the returns, Brennan also commented: "will probably need to prepare a royalty agreement for that." GX 950.

Kohn, Chollet, and Simmons sometimes advised clients to open bank accounts in the names of the GEP limited partnerships and to move money into these accounts in amounts that matched the fictitious royalties and management fees claimed on the tax returns. Frequently, the opening of bank accounts and the movement of money occurred after the close of the tax year. When clients transferred money into the GEP limited partnership bank account, Kohn, Chollet, and other TKP employees advised them that they could immediately transfer the money out.

For example, in a series of emails between Sullivan and Kohn beginning on December 31, 2012, the last day of the tax year, the following conversation took place:

> Sullivan: Michael, I just remembered do I need to transfer money back and forth in my accts? If so can I do it online and which acct. to which acct.?
>
> Kohn: You move it to the LP account. On line is fine. Move $400k if possible.

14

> Sullivan: I don't have an lp acct. set up yet? Didn't know I was supposed too.
>
> Kohn: Don't worry. I will take care of everything.
>
> Sullivan: So I don't need to do anything today?
>
> Kohn: No.

GX 895.

On August 15, 2018, client Jay Snow ("Snow") wrote an email to Chollet with the subject line "Money movement." Snow asked: "Do I need to move money from that LP account to other account before transferring it to my personal account?" Chollet responded: "Move the money then [sic] to your Asset Management Company bank account and then take it out." GX 850.

On July 30, 2020, after Brandi Davis ("Davis"), Simmons' office manager, confirmed to Brennan that she would help Gregory Bower ("Bower") open the accounts, she asked: "When you say move through it. Does it need to sit there or can he move it in and out[?]." Brennan responded: "You can move it in and out as fast as you want." GX 1428.

At times, and unbeknownst to the clients, instead of using fictitious royalties or management fees, Kohn and Chollet fraudulently reduced the clients' income by falsely listing on a Schedule K-1, the GEP limited partnership or INFC itself as an owner in the clients' operating businesses. The fraudulent Schedule K-1 thereby directly allocated some of the client's business income to the GEP limited partnership or the charitable organization. In reality, the charity never became a partner in the client's operating business. Ricketts testified, with respect to the clients that testified at trial, that INFC was unaware that it was a partner in their GEP partnerships. Kohn and Chollet did this in some years despite using a fictitious royalty or management fee in other years.

15

For example, for tax year 2017, Kohn and Chollet deducted as a business expense a fictitious $300,000 royalty from Sullivan's operating business to Sullivan's GEP limited partnership, which was owned 98% by INFC. GX 193. For tax year 2019, Kohn and Chollet falsely listed INFC as a partner in Sullivan's operating business, directly allocating 100% of the profit to it for that year. GX 200. As another example related to Gregory Rose, for tax year 2016, Kohn and Chollet falsely listed INFC as a partner in TPI Nevada Star LP, the operating entity for the Titleist Performance Institute ("TPI"). Kohn and Chollet allocated 99% of TPI's income to INFC. GX 129. Sullivan, Rose, and Ricketts testified they were unaware of these ownership arrangements.

## IV.    **Tax Preparation**

Clients sent supporting documentation to Kohn and Chollet for the preparation of their tax returns. Simmons was also involved in tax preparation, as clients often worked through him and his office to facilitate the preparation of their returns. Kohn also requested information from Simmons and his office staff related to clients' insurance policies and their face values for the purpose of preparing tax returns. Simmons and his staff would receive information from clients within the Western District of North Carolina and elsewhere, and then provide this tax return preparation information to Kohn and Chollet in St. Louis, Missouri, from Jefferson, North Carolina.

Kohn, Chollet, and Simmons prepared and caused to be prepared, procured, counseled, and advised, and filed, and caused to be filed, with the IRS various false tax forms for the GEP clients. Kohn and Chollet filed Forms 1065, "U.S. Returns of Partnership Income" ("Forms 1065"), for their clients' GEP limited partnerships that listed INFC as an owner. However, INFC often did not know about the GEP limited partnerships until it received Schedules K-1, "Partner's

Share of Income, Deductions, Credits, etc." ("Schedules K-1"), reflecting its purported ownership in them, which was frequently long after the close of the respective tax years, if at all.

The GEP limited partnership tax returns did not list any asset on the Schedule L, "Balance Sheets per Books," which would qualify or substantiate a royalty expense. Further, the clients' books and records, where available, did not contain a royalty expense or list an asset that qualified for a royalty expense. There was no asset owned or controlled by the clients' legitimate businesses that was contributed to the GEP partnership or listed as an asset on the books of both the legitimate business and the GEP partnership.

Using a fictitious royalty expense, Chollet also prepared and caused to be prepared false tax returns for herself. For the 2015 to 2019 tax years, Chollet used her GEP limited partnership, Green Bean Holdings, and Chollet & Associates to fraudulently underreport her income. For example, Chollet fraudulently reduced her 2015 taxable income by claiming a fictitious $50,000 royalty expense on Chollet & Associates' Form 1065. GX 229. Because Chollet & Associates' income flowed through to Chollet's Form 1040, this fictitious royalty expense fraudulently reduced Chollet's personal taxable income. GX 223. Chollet reported a corresponding $50,000 of income on Green Bean Holdings' 2015 Form 1065. GX 231. Chollet listed INFC as owning a 98% limited partnership interest in Green Bean Holdings in 2015. *Id.*

At trial, the United States presented overwhelming evidence that Kohn, Chollet, and Simmons prepared, and caused to be prepared, procured, counseled, and advised the preparation or presentation of tax returns, including, but not limited to, the returns listed in the table below. These false tax returns included fictitious royalty expenses, fictitious management fees, and fraudulent changes in ownership structure, resulting in significant tax harm to the United States.

| Taxpayer/Client | Tax Year | Tax Forms Prepared and Filed | Royalty, Mgt. Fee, or Ownership Structure | Preparer of Form 1040 | GX |
|---|---|---|---|---|---|
| Matthew and Michelle Alepra | 2018 | 1120S, 1065, 1040 | Royalty | Chollet | 1, 3-6 |
| Matthew and Michelle Alepra | 2019 | 1065, 1040 | Royalty | Chollet | 2, 7-10 |
| Larry and Karen Bare | 2012 | 1120S, 1065, 1040 | Royalty | Kohn | 12, 20-21 |
| Larry and Karen Bare | 2013 | 1120S, 1065, 1040 | Management Fee | Kohn | 13, 23-24 |
| Larry and Karen Bare | 2014 | 1065, 1040 | NOL | Thompson | 14, 25-26 |
| Larry and Karen Bare | 2015 | 1120S, 1065, 1040 | NOL | Kohn | 15, 27-28 |
| Gregory and Nancy Bower | 2017 | 1120S, 1065, 1040 | Royalty | Chollet | 33, 36-38 |
| Gregory and Nancy Bower | 2018 | 1120S, 1065, 1040 | Royalty | Chollet | 34, 39-41 |
| Gregory and Nancy Bower | 2019 | 1120S, 1065, 1040SR | Royalty | Kohn | 35, 42-44 |
| Damian Novak | 2017 | 1120S, 1065, 1040 | Ownership Structure | Kohn | 93, 96-100 |
| Damian Novak | 2018 | 1120S, 1065, 1040 | Royalty and Ownership Structure | Chollet | 94, 101-109 |
| Damian and Melissa Novak | 2019 | 1120S, 1065, 1040 | Royalty and Ownership Structure | Chollet | 95, 110-115 |
| Gregory and Amy Rose | 2016 | 1065, 1040 | Ownership Structure | Kohn | 129, 131, 133, 160, 166 |
| Gregory and Amy Rose | 2017 | 1065, 1040 | Ownership Structure | Chollet | 140, 141, 143, 161, 169, 170 |
| Jay and Colleen Snow | 2018 | 1065, 1040 | Royalty and Management Fee | Chollet | 175, 177, 179-182 |
| Jay and Colleen Snow | 2019 | 1065, 1040 | Royalty and Management Fee | Chollet | 176, 184, 186-189 |
| Craig and Sunnie Sullivan | 2017 | 1065, 1040 | Royalty | Kohn | 190, 193-196 |
| Craig and Sunnie Sullivan | 2018 | 1065, 1040 | Ownership Structure | Chollet | 191, 197-199 |

18

| Craig and Sunnie Sullivan | 2019 | 1065, 1040 | Ownership Structure | Chollet | 192, 200 |
|---|---|---|---|---|---|
| Catherine and Todd Chollet | 2015 | 1065, 1040 | Royalty | Chollet | 223, 229, 231-232 |
| Catherine and Todd Chollet | 2016 | 1065, 1040 | Royalty | Chollet | 224, 233, 235-236 |
| Catherine and Todd Chollet | 2017 | 1065, 1040 | Royalty | Chollet | 225, 237-239 |
| Catherine and Todd Chollet | 2018 | 1065, 1040 | Royalty | Chollet | 226, 240-242 |
| Catherine and Todd Chollet | 2019 | 1065, 1040 | Royalty | Chollet | 227, 243-245 |

Specifically, with respect to Counts 2 through 12, the evidence at trial proved that Kohn, Chollet, and Simmons did willfully aid and assist in, and procure, counsel, and advise the preparation and presentation to the IRS for the tax years listed below, of the following tax returns amongst others, along with the accompanying schedules, for the taxpayers and entities listed below which were false and fraudulent as to a material matter. The tax returns reported false items in the amounts listed below, among others, whereas Kohn, Chollet, and Simmons then and there well knew and believed the amounts on the lines listed below were substantially understated.

| Taxpayer(s) | Tax Return (GX) | Approximate Filing Date | False Item | Amount Reported |
|---|---|---|---|---|
| Craig and Sunnie Sullivan | 2017 Form 1040 (GX 190) | 9/10/2018 | Total income | $175,982 |
| Craig and Sunnie Sullivan | 2018 Form 1040 (GX 191) | 09/16/2019 | Total income | $150,838 |
| Craig and Sunnie Sullivan | 2019 Form 1040 (GX 192) | 10/01/2020 | Total income | $228,096 |
| Larry and Karen Bare | 2015 Form 1040 (GX 15) | 02/9/2017 | Total income | -$418,185 |
| Larry and Karen Bare | 2016 Form 1040X (GX 17) | 12/17/2018 | *Attached Form 1040*<br><br>Total income | -$649,512 |
| Greg and Nancy Bower | 2017 Form 1040 (GX 33) | 4/30/2020 | Total income | -$4,710 |
| Greg and Nancy Bower | 2018 Form 1040 (GX 34) | 5/19/2020 | Total income | $65,591 |

19

| Greg and Nancy Bower | 2019 Form 1040-SR (GX 35) | 9/22/2021 | Total income | $150,730 |
|---|---|---|---|---|
| Damian Novak | 2017 Form 1040 (GX 93) | 02/15/2019 | Total income | $121,770 |
| Damian Novak | 2018 Form 1040 (GX 94) | 1/29/2020 | Total income | $104,883 |
| Damian and Melissa Novak | 2019 Form 1040 (GX 95) | 10/28/2020 | Total income | $215,249 |

## V.    **Insurance**

Kohn falsely told the clients that Simmons was the only person who could obtain the insurance products needed for the GEP.   On October 2, 2017, Kohn, responding to Novak's email asking to use his own insurance agent, said:

> As far as other insurance people, many people have tried to use their friends over the past 25 years.  I've worked with Shane now for 7 years…I would say in about 50% of the cases people suggest using their friends.  In 25 years I've found one agent who could do what Shane [does].

GX 941.

Matthew Alepra testified that on multiple occasions Kohn and Chollet told him that he needed a certain type of life insurance and that he should contact their insurance broker in North Carolina.  Alepra explained that he was a licensed insurance agent, so he did not see the need to contact the broker.  Kohn and Chollet never responded and Alepra never obtained insurance.  On or about November 20, 2019, Kohn asked Alepra for a copy of his life insurance policy.  GX 835. Alepra testified that he reminded Kohn that he did not need to use the insurance agent in North Carolina.  Kohn said that Alepra would not understand what was needed for the GEP, but he never confirmed that Alepra had the requisite life insurance.

During the insurance application process, Kohn and Simmons provided and caused to be provided false information to Lincoln Financial regarding the purpose of and need for the insurance, false personal and financial information about the applicants, and false information

20

about the ultimate beneficiary of the life insurance policies.  Simmons emailed and caused to be emailed the applications and supporting documentation to Lincoln Financial.

For example, in an application for $5,000,000 of insurance for Gregory Rose ("Rose") submitted on September 28, 2016, Simmons' cover letter described Rose's business as significantly increasing in value recently with an even greater increase expected in the near future. GX 333.  The letter explained that Rose's business had a $30 million facility, contracts with the governments of Mexico and China, and was projected to have a value of $155,000,000 in five years.  *Id*.  Rose testified that none of this was true.  The letter concluded that the insurance was necessary "based upon this value and the expansion of [his] personal estates."  *Id*.  The letter did not mention the GEP or the charity.  *Id*.

In an application for $3,200,000 of insurance for Sullivan submitted on November 21, 2014, Simmons' cover letter said that the insurance was needed "from both an estate planning standpoint and an income replacement standpoint."  Simmons had previously applied for insurance for Sullivan in 2012 in furtherance of the GEP.  Despite this common purpose, Simmons said this 2014 application was "completely separate from the plan put into place … in 2012."  The letter did not mention the GEP or the charity.  GX 361.

In an application for $5,000,000 of insurance for Gregory and Nancy Bower submitted on January 8, 2015, Simmons's cover letter said that the insurance was needed to accomplish their "estate planning needs as well as their income replacement needs."  The letter did not mention the GEP or the charity.  GX 396.

Simmons earned a commission for each policy he sold amounting to approximately 95% of the policy's first year premium.  Despite sharing commissions with Kohn and Chollet, Simmons falsely represented in his annual compliance forms that he did not share commissions

with anyone. GX 566. Simmons deposited the commissions into a bank account in his name at LifeStore Bank. After Simmons received the commissions, Simmons transferred the money to the Simmons Family LP bank accounts located at Fifth Third Bank and LifeStore Bank in Jefferson, North Carolina. GX 1541.

Simmons sent approximately 50% of the GEP client commissions to Kohn and Chollet by wiring the funds and mailing checks. GX 1541. Simmons labeled many of these payments as "professional services," "professional fees," "tax planning," "return review," and "legal fees." In total, between 2014 and 2019, Simmons paid Kohn and Chollet over $1.1 million in commissions. *See* GX 1339, 1350, pp. 13, 18, 1352, p. 12, and 1541.

Simmons, Kohn, and Chollet communicated by email about payment of the commissions. For example, on October 31, 2014, Kohn emailed Simmons and said "You told me the amount due me was about $125,000. In this regard, you were kind enough to advance me a total of $110,000 in 3 wires…This leaves $15,000 due me from the [W.F.] Case (Plus some [S.] commission)." GX 1094. On February 21, 2020, Simmons emailed Kohn and Chollet to provide them with the tracking number for a check he mailed to them. Chollet inquired how much the check was for and Simmons responded $21,300. GX 1152.

## VI.  **Client Testimony**

Numerous GEP clients testified about Kohn, Chollet, and Simmons's promotion, marketing, and sale of the GEP, their understanding of how it was implemented, and their interactions with Kohn, Chollet, and Simmons. This testimony and the accompanying exhibits overwhelmingly established the conspiracy and Kohn's, Chollet's, and Simmons' preparation of false tax returns.

### A. Damian Novak

Novak testified he was referred to Kohn by his business associates who were already using Kohn. He had several disputes with Kohn over the years and was not sure if he ever formally entered into the GEP. He first met Kohn in person at his attorney's office; Simmons was also present.

Novak understood that all the profits pledged to the charity in Novak's GEP were available to Novak for his own personal benefit. Novak did not need to notify or seek approval from INFC to take money out of the partnership, but instead retained full access to the money. Novak did not need to maintain books on the amount of money he spent that was allocated to INFC as Kohn said he would maintain those records for Novak.

Most of Novak's understanding of the tax plan came from both Kohn and Simmons. Novak wanted to bring his own life insurance representative to the table, but Simmons was marketed as the life insurance guy for the plan and as being integral in the process. Simmons managed the details of the life insurance policies, ensuring the correct beneficiaries named were consistent with Kohn's tax plan. However, the life insurance applications admitted at trial showed that Novak's GEP partnership was called DTN Real Estate Holdings, and the beneficiary of Novak's life insurance policy was Novak Family, LP. GX 255, 260. Moreover, Novak testified that he knew Simmons and Kohn were sharing commissions and Simmons would say "he controlled the money and got things done."

Between 2017 and 2019, a large portion of Novak's income was assigned to INFC through DTN Real Estate Holdings LP. GX 99, 104, 105, 113. Novak did not know that INFC was listed as a 98% owner of DTN Real Estate Holdings. *Id*. According to records received from INFC and testimony at trial from Ricketts, INFC never signed a partnership agreement for DTN Real Estate Holdings. In 2018 and 2019, another one of Novak's entities called DTN Internet Inc.,

23

paid, on paper, a $750,000 royalty to DTN Real Estate Holdings. GX 108, GX 109, GX 115. Novak did not know what this royalty was for, and he did not determine the amount.

By mid-2020, Novak grew frustrated working with Kohn and Chollet took him over as a client. Simmons told Novak that Chollet fully understood everything and could manage it. From that point forward, Chollet was his point of contact and handled his tax situation. Novak also testified that he was told about Kohn's conviction, including that he plead guilty to protect clients, and that comforted him. Novak testified that if he had known the truth, he would not have worked with Kohn.

**B. Gregory Rose**

Rose testified at trial that he had a chiropractic practice until the early 2000s when he met David Phillips ("Phillips"). Rose and Phillips opened the TPI under the umbrella of Acushnet Golf. Eventually, Acushnet spun off TPI and Rose and Phillips purchased it. Rose and Phillips made TPI into a profitable company and they were referred to TKP by a colleague. Rose testified that Kohn pitched the GEP and he did not understand it except that Kohn created multiple entities for the plan, though he did not understand their purposes.

Rose testified that he often received just signature pages from Kohn. Rose also understood that Chollet comprehended the tax plan because he was concerned that someone could take over if Kohn was hit by a bus. Kohn and Chollet assured him that she understood everything.

INFC was listed as the 99% owner of TPI Nevada Star, LP. GX 121, GX 129, GX 140, GX 153. This entity was the operating TPI entity. Rose never knowingly signed away 99% of his operating business to INFC. Rose reviewed a partnership agreement with his signature on a signature page at the end, but that signature page followed a separate blank signature page that was not identical to the one he signed. *See* Defense Exhibit. According to records received from

24

INFC and testimony from Ricketts, INFC never signed a partnership agreement for TPI Nevada Star LP.

Kohn introduced Rose and Phillips to Simmons. Rose purchased multiple insurance policies through Simmons. Rose did not know that Simmons shared commissions with TKP. When reviewing insurance applications and cover letters submitted to Lincoln Financial by Simmons, Rose identified multiple false entries. His income and net worth figures were inflated on the insurance applications. The descriptions of TPI's future business prospects and valuations in the cover letters were also false. For example, it was not true that TPI had contracts with the governments of China and Mexico. GX 306. Rose's insurance policies did not name TPI Nevada Star, his GEP partnership, as the beneficiary. GX 313, 319, 322, 325, 328, 331, 334.

Rose testified that he learned that Kohn had a criminal record. When Rose confronted Kohn about it, Kohn explained he went to jail for six months for defending a client and the attorney-client privilege. This provided Rose with comfort, particularly because Rose had been scammed by a financial advisor before. Had Rose known that Kohn pleaded guilty to obstructing the IRS by creating tax plans that relied on fake transactions and that lacked economic substance, he would never have done business with him.

### C. Matthew Alepra

Alepra testified at trial. He is married to Dr. Michelle Alepra and they were introduced to TKP in 2016 and eventually signed up for the GEP in 2018, working with both Kohn and Chollet. GX 828. Chollet created the Alepras' GEP partnership, Piedmont Holdings LP. Alepra was unaware that royalty expenses were reported between his and his wife's operating businesses and Piedmont Holdings. Neither of the Alepras had intangible property to justify royalty payments. Piedmont Holdings' tax returns also did not report any valuable intangible property. GX 5 and 9. Alepra testified that the only purpose of the GEP was tax savings.

25

Alepra testified that he and Dr. Alepra transferred money to a Piedmont Holdings bank account at TKP's direction. Chollet told the Alepras that they could take the same pot of money and transfer it back and forth between accounts; for example, transferring the same $50,000 back and forth twice would result in $100,000 in transfers to the GEP partnership.

Despite being pressured multiple times to use Simmons to purchase insurance, the Alepras never purchased insurance specifically tied to the GEP. Alepra, a financial advisor with an insurance license, could write a policy himself and he did not understand why they could not use their existing term policies or why he could not write the policy. GX 835, 836.

The Alepras were told by Chollet to use INFC for the charity despite their wanting to use their alma mater. According to records received from INFC and testimony from Ricketts, INFC never signed a partnership agreement for Piedmont Holdings.

When the Alepras asked Chollet about preparing their 2020 tax returns, Chollet said that TKP was no longer recommending the GEP. GX 837. The Alepras had transferred $92,500 into Piedmont Holdings' account in 2020. *Id*. When the Alepras asked Chollet what to do about the transfers, she responded in an email dated March 23, 2021, and said: "we will just consider the $92,500 a capital contribution and the cash you took out a distribution so we won't need to do that return." *Id*.

**D. Jay Snow**

Snow testified at trial. The Snows were introduced to Chollet by a mutual friend. Chollet implemented a GEP for the Snows. GX 848. Snow testified that he understood that the plan called for the payment of a royalty from his bariatrics medical practice to his GEP entity, Snow Family Holdings LP. Snow did not determine the royalty amount and did not know how it was determined. He also did not know what intangible property he had that would justify a royalty

payment. Snow Family Holdings also did not report valuable intangible property on its tax returns.

Snow transferred money pursuant to the plan at Chollet's direction. Snow had a call with Chollet where she instructed him that he could make a deposit to Snow Family Holdings, move the money back out the same day, and then redeposit the money again to Snow Family Holdings' bank account. GX 850 and 851. According to Chollet, if it was the same $100,000 deposit each time, it would total $200,000 in deposits for that day.

Snow did not understand that INFC was listed as a 98% owner of Snow Family Holdings. According to records received from INFC and testimony from Ricketts, INFC never signed a partnership agreement for Snow Family Holdings.

### E. Karen Bare

Bare testified at trial. The Bares were introduced to Kohn in 2011. Kohn implemented a GEP for them. In 2013, Kohn fraudulently reduced their income by reporting a $1 million management fee paid from their operating business to their GEP partnership. Bare did not determine this amount nor did she understand how the amount was determined. This $1 million expense created a net operating loss that caused future tax returns to be false. GX 876. One of these false returns was 2015. GX 27. Between the carryover net operating loss and current year operations, the business was reporting a loss. As such, in a January 13, 2016, email, Kohn said "I don't want to accrue any Royalty payments for 2015." GX 878. Bare testified that Simmons was responsible for obtaining the life insurance for the GEP.

Kohn provided Bare with a letter he sent to a third-party concerning his conviction. GX 873. The letter was filled with falsities, including that:

> . . . in exchange of my agreement to plead to one count in violation
> of section 7212, all of my clients would receive a complete and
> total release, no files would be read or seized by the Government,

27

> my assets and those of my family would remain ours and I would
> not be investigated ever again nor would my then clients or other
> members of my extended family.

*Id*. In an email dated September 8, 2015, Kohn falsely told the Bares that the statute which he plead guilty to had been repealed. Kohn also told them that he pleaded guilty in exchange for the Government's agreement to release his clients and family from further investigation. GX 877. No such promises were contained in Kohn's plea agreement. *See* Stipulation.

### F. Gregory Bower

Bower testified at trial. Bower owned and operated a pharmacy in Jefferson, North Carolina. Simmons introduced Bower to Kohn and Kohn implemented a GEP for Bower. From 2017 through 2019, Bower's returns reported a royalty payment from the pharmacy to his GEP partnership. GX 36, 37, 39, 40, 42, 43. Bower did not know how the royalties were determined and did not provide the amounts, nor was he aware that his pharmacy paid a royalty. The pharmacy's internal books and records did not reflect royalty payments. GX 993-1000. The GEP partnership's returns also did not report a valuable intangible property asset. GX 36, 37, 39, 40, 42, 43. Simmons was responsible for helping the Bowers obtain life insurance. Simmons and Kohn provided the Bowers with a script of how to answer questions from the insurance company about their insurance applications. GX 984, 985. After the investigation became overt, Bower had a conversation with either Simmons or Kohn where they told him that he may be carrying too much life insurance.

Prior to the summer of 2020, Bower's GEP partnership did not have a bank account and no monies were moved. GX 989, 990. In August 2020, Bower first opened a bank account and moved $350,000 into the partnership bank account. They were directed to move those funds by TKP, through Davis, and did not know what the transfer of funds represented. GX 991.

According to records received from INFC and testimony from Ricketts, it never signed a partnership agreement for Bower's GEP partnership. Bower first learned about the existence of INFC when the IRS special agents interviewed him for this investigation. Prior to that interview, Bower had no knowledge of INFC.

### G. Craig Sullivan

Sullivan testified at trial that he was introduced to Kohn in 2011 by Simmons and pitched the GEP. Sullivan eventually signed up for the plan but did not understand the specifics. GX 888, 889. Simmons was responsible for obtaining the life insurance for the GEP. While INFC was listed as the partner in either Ashe Medics, LP or Sullivan Properties of Ashe, LP, the life insurance applications for Sullivan's GEP were written in the name of Ashe Medics Properties, LP. GX 362, 367, 370.

In 2017 and 2018, INFC was listed as a partner in a partnership called Sullivan Properties of Ashe. In 2017, Sullivan's operating entity, Ashe Medics LP, purportedly paid a royalty to Sullivan Properties of Ashe. Sullivan did not know about the royalty and did not know how it was determined. The expense was not listed on Ashe Medics' internal books and records. GX 910, 911. Ricketts testified that INFC did not know it was a partner in Sullivan Properties of Ashe.

Importantly, the expense was not and could not have been paid in 2017. As late as the beginning of 2020, Sullivan Properties of Ashe did not have a bank account. Additionally, the $300,000 royalty was listed as a liability on Ashe Medics' tax return and a receivable on Sullivan Properties of Ashe's tax return. These entries confirm that TKP knew the expense was not paid, and, despite Ashe Medics being a cash-basis entity, TKP deducted the expense regardless. Also, Sullivan Properties of Ashe's tax return did not report a valuable IP asset on the balance sheet that would qualify for a royalty.

29

In 2019, INFC was listed as a partner in Ashe Medics and directly allocated income from Sullivan's operating business. Sullivan testified that he never agreed to give away or sell essentially all his ownership in Ashe Medics to INFC nor did he know that INFC was allocated 100% of Ashe Medics' profits. Rickets testified that INFC did not know it was a partner in Ashe Medics.

Sullivan often received just signature pages to sign. In December 2016, Kohn sent Sullivan a blank signature page to sign. Kohn said that he "made some technical changes to your partnerships to comply with a couple changes in the Code." Sullivan sent back a digitally-signed page. GX 935. Sullivan was not aware that someone cut and paste this digital signature onto a partnership agreement that said Sullivan was transferring a 98% interest in his operating company to INFC. Sullivan's signature was also pasted onto INFC's signature line, so INFC was unaware of this agreement as well. GX 936.

## VII. Simmons' Personal Income Tax Return and Kohn's and Chollet's Preparation

Simmons engaged Kohn and Chollet to prepare his individual and business income tax returns. GX 202, 204-211, 212, 214, 217, 218. These tax returns underreported business income and overstated business expenses. Kohn's name was usually listed as the paid preparer, but on some occasions, it was Chollet or another TKP employee.

Simmons reported Bohicket LLC ("Bohicket") on Forms 1065 for 2012, 2014, 2017, 2018, and 2019. GX 212, 214, 217, 218, 246. Simmons's portion of Bohicket's claimed profit or loss flowed through to the Schedule E attached to his Forms 1040, except for Simmons's 2015 amended Form 1040 which reported Bohicket as a Schedule C business. GX 202, 204-211.

Simmons did not file a 2016 Form 1065 for Bohicket, nor did he report the income on his Form 1040 that year. GX 208, 213. On September 15, 2017, Kohn emailed Simmons a draft of his 2016 Form 1040. GX 1132. The draft return had two Schedules C, one for each of Simmons'

30

businesses. *Id.* Kohn told Simmons that he was not going to file a 2016 Form 1065 for Bohicket. The draft return had Bohicket's income information because Davis had provided it already. On October 3, 2017, Davis sent to TKP Simmons' personal tax information from Jefferson, North Carolina, including his wife's Form W-2 and Forms 1099 issued to Simmons personally. GX 1133. In November 2017, Simmons filed a 2016 Form 1040 that had only one Schedule C on it. GX 208. The filed return did not report any of the Form 1099 income that Davis sent to TKP in October of that year, including a Form 1099 from Lincoln to Simmons reporting income of $476,531.45. *Id.* However, the filed return *did* include Simmons' wife's Form W-2 income. The false total income qualified Simmons for an earned income credit. *Id.*

Because part of Simmons's business was the sale of securities, Simmons was subject to additional regulatory requirements. Davis testified that Simmons was required to segregate the insurance side of his business from the securities side of his business. The securities income was paid to Simmons in his individual name whereas the insurance income was paid to Bohicket. When Simmons filed 2017 through 2019 Forms 1065 for Bohicket, TKP effectively consolidated his two separate businesses into one. In an email dated November 28, 2018, TKP confirmed that it would zero out the income on Simmons' Schedule C by booking a matching expense to Bohicket. GX 1143. Bohicket would then report the combined gross receipts of the businesses.

On or about March 2, 2017, Simmons filed a false amended 2015 Form 1040 with the IRS. GX 207. Simmons signed this tax return under penalty of perjury, and it was prepared by Kohn. *Id.* The Form 1040 reported false total income on Line 22 because the two Schedules C overstated legal expenses. *Id.*

On or about December 12, 2018, Simmons filed a false 2017 Form 1040 with the IRS. GX 209. Simmons signed this tax return under penalty of perjury, and it was prepared by Kohn.

*Id.* The Form 1040 reported false total income on Line 22 stemming from the Jefferson Insurance Group Schedule C and the Schedule E that included income from Bohicket. *Id.* The Jefferson Insurance Group Schedule C wiped out all its gross receipts with a matching expense paid to Bohicket. Furthermore, the Bohicket Form 1065, prepared by Kohn and filed by Simmons on December 6, 2018, reported false legal expenses. GX 217.

On or about October 18, 2019, Simmons filed a false 2018 Form 1040 with the IRS. Simmons signed this tax return under penalty of perjury, and it was prepared by Kohn. The Form 1040 reported false total income on Line 6 stemming from the Jefferson Insurance Group Schedule C and the Schedule E that included income from Bohicket. The Jefferson Insurance Group Schedule C wiped out all gross receipts with a matching expense paid to Bohicket. The Bohicket Form 1065, prepared by Chollet and filed by Simmons on October 16, 2019, also reported false legal expenses.

On October 15, 2020, Simmons filed a false 2019 Form 1040 with the IRS. Simmons signed this tax return under penalty of perjury, and it was prepared by Kohn. The Form 1040 reported false total income on Line 7b stemming from the Jefferson Insurance Group Schedule C and the Schedule E that included income from Bohicket. The Jefferson Insurance Group Schedule C wiped out all gross receipts with a matching expense paid to Bohicket. The Bohicket Form 1065, prepared by Chollet and filed by Simmons on October 15, 2020, significantly underreported gross receipts. Despite receiving Forms 1099 totaling approximately $800,000 between Bohicket and Simmons personally, Simmons reported only $316,793 of gross receipts.

To secure and maintain financing for his business and himself personally, Simmons provided false tax returns and financial information to Yadkin Bank. The information was false in the following ways: Simmons provided the bank with a 2013 Form 1065 for Bohicket which

32

was never filed with the IRS. Simmons provided the bank with a 2014 financial statement for Bohicket that reported net income of $464,750. The 2014 Form 1065 for Bohicket filed with the IRS reported a loss of -$92,849.

To refinance the loan on his personal residence, Simmons provided false tax returns to LifeStore Bank. Specifically, Simmons provided 2012 through 2014 Bohicket Forms 1065 and his personal 2013 and 2014 Forms 1040 to the bank. The information was false in the following ways: Simmons provided the bank with a 2013 Form 1065 for Bohicket which was never filed with the IRS. The 2014 Form 1065 for Bohicket provided to the bank did not match the Form 1065 filed with the IRS. The Form 1065 Simmons provided to the bank showed less business expenses, and thus reflected greater profits than the return filed with the IRS. Simmons provided the bank with a 2013 Form 1040 even though no such tax return was filed with the IRS. Simmons provided the bank with a 2014 Form 1040 that reported $10,770 of taxable income notwithstanding the 2014 Form 1040 filed with the IRS reported taxable income of -$117,174.

The bank notified Simmons that the 2014 Form 1040 did match the transcript that the bank independently received from the IRS. GX 1121. In response, Kohn sent the bank a letter, enclosing an amended 2014 Form 1040 for Simmons. GX 1122. Again, no such amended tax return was filed with the IRS. In addition, the bank sent Simmons IRS transcripts showing that there was no 2013 Form 1040 filed with the IRS. GX 1121. Simmons filed his false 2015-2019 Forms 1040 and 1040X *after* receiving this notification from LifeStore Bank.

## ARGUMENT

### I.  Literal Truth

The Defendants argue that the Court must grant their motions for judgments of acquittal with respect to Counts 2 through 22 because the false item identified on each tax return, "total

33

income," was a mathematically correct number. As such, the statements were literally true. Contrary to their arguments, the narrowly-tailored literal truth defense does not apply to the returns in this case.

A perjury conviction cannot be sustained if the alleged false statement was literally true, even if made with the intent to deceive. *United States v. Good*, 326 F.3d 589, 590 (4th Cir. 2003). However,

> the literal-truth defense is a "narrow one" .... "It applies only where a defendant's allegedly false statements were *undisputedly* literally true" .... It doesn't "apply in cases which the focus is on the ambiguity of the question asked. Nor does it apply to an answer that would be true on one construction of an arguably ambiguous question but false on another."

*United States v. Smith*, 54 F.4th 755, 767 (4th Cir. 2022) (quoting *United States v. Sarwari*, 669 F.3d 401, 406 (4th Cir. 2012)) (emphasis in original). At worst, the total income lines charged in this case were ambiguous, meaning the literal truth defense does not apply.

The Defendants cite to *United States v. Reynolds*, 919 F.2d 435, 436-37 (7th Cir. 1990). In *Reynolds*, the defendant filed a Form 1040EZ reporting all the categories of income requested on the form but omitting a category of income not reportable on that form. Although the defendant's responses on the form were literally true, the prosecution characterized these responses as misleading because the defendant had a category of income (the unreported income) which disqualified him from using that form. *Id*. at 437. The Seventh Circuit held that, although the form was misleading, the literal truth of the statements on the form precluded a Section 7206(1) conviction. The court stated, however, that Reynolds could be tried for violations of Section 7201 or Section 7203. *Id*. The Seventh Circuit adopted a similar position with respect to Form 1040A, which, like Form 1040EZ is a simplified tax form, in *United States v. Borman*, 992 F.2d 124, 126 (7th Cir. 1993).

34

The Third Circuit addressed and distinguished the "*Reynolds* defense" in *United States v. Gollapudi*, 130 F.3d 66 (3d Cir. 1997). There, the taxpayer was charged with a violation of section 7206(1) for listing a false amount of withholding on a Form 1040. *Id*. at 68. The taxpayer argued that he had in fact withheld taxes but had simply not paid over the withheld funds to the IRS, and that his returns thus were "literally true" under *Reynolds*. *Id*. at 72. The Third Circuit rejected the taxpayer's claims as a factual matter, crediting the testimony of an IRS agent that no taxes were withheld. *Id*. But the court of appeals went on to note that *Reynolds* and *Borman* offer a defense to Section 7206 only when there is no specific line item which can be proven false. *Id*. According to the Third Circuit, *Reynolds* stands for the simple proposition that using the wrong tax form -- one that does not contain an identifiable line item that can be charged as false -- cannot constitute a violation of Section 7206(1). *Id*.

Prior to 1993, the jurat on Forms 1040EZ and 1040A, read as follows:

a) Form 1040EZ:

> I have read this return. Under penalties of perjury, I declare that to the best of my knowledge and belief, the return is true, correct, and complete.

b) Form 1040A:

> Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than the taxpayer) is based on all information of which the preparer has any knowledge.

In 1993, in response to the *Reynolds* and *Borman* cases, the IRS modified the jurat on the Form 1040EZ to include the additional language highlighted below:

> I have read this return. Under penalties of perjury, I declare that to the best of my knowledge and belief, the return is

35

> true, correct, and **accurately lists all amounts and sources of income I received during the tax year**.

In that same year, the IRS also changed the jurat on the Form 1040A to read:

> Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statement, and to the best of my knowledge and belief, they are true, correct, and **accurately list all amounts and sources of income I received during the tax year**. Declaration of preparer (other than the taxpayer) is based on all information of which the preparer has any knowledge.

The additional language was incorporated to forestall any potential *Reynolds* literal truth defense, and *Reynolds* has no continuing validity following the change in the language of the jurat on tax returns. *See, e.g., United States v. Ladum*, 141 F.3d 1328, 1335-36 (9th Cir. 1998); *United States v. Kasper*, 2012 WL 2573259, at *2 (W.D.N.Y. June 29, 2012) ("Here, contrary to Defendants' repeated representation that Defendants have been indicted for failing to report their gross corporate distributions for which no line exists on the 1040 form, the indictment actually charges them with falsely reporting their total income, which is required to be reported on Line 22. *Reynolds* and *Borman* are therefore not persuasive"); *United States v. Fattah*, 2015 WL 94118, at *3 (E.D.P.A. Jan. 7, 2015) (denying a motion to dismiss a 26 U.S.C. § 7206(1) count based on a false adjusted gross income amount reported on a Form 1040EZ because "Fattah, unlike the defendants in *Reynolds* and *Borman*, attested not only that his answers to the questions on the Form 1040EZ were true but also that the form contained an accurate accounting of his entire income for the year").

In this case, the jurat on each charged return states,

> Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which the preparer has any knowledge.

36

Unlike in *Reynolds* and *Borman*, the Forms at issue in this case are Forms 1040 or 1040X, and they contain a line to report total income. This line is false because it did not report all the taxpayer's income. "Given that [total income] is derived arithmetically from the other lines, the understatement [on one of the other lines] automatically causes total income to be understated." *United States v. Crockett*, 435 F.3d 1305, 1315 (10th Cir. 2006). *See also Ladum*, 141 F.3d at 1336 (noting that the Schedule C was false, making Line 13 of the Form 1040 false, as well as Line 30, adjusted gross income, and concluding that because the taxpayer "used this figure in calculating line 30 [adjusted gross income] … the figure represented in line 30 was not actually all of [the defendant's] adjusted gross income").

The lines charged in the Indictment represent something – a taxpayer's total income. The Defendants want the Court to believe that there is a single interpretation of the total income line, which is "this is the addition of the preceding lines without any regard to whether those lines or the taxpayer's total income are true." Clearly, the returns do not even come close to saying that. Rather, they say "this is your total income." Considering the context, including the jurat which confirms the accuracy of the return and accompanying schedules, the obvious conclusion is that the total income line asked for a true and accurate reporting of the taxpayer's total income. *Smith*, 54 F.4th at 768 ("in *United States v. Hairston*, 46 F.3d 361 (4th Cir. 1995), … we reversed a perjury conviction where the context made it 'obvious' that a defendant used a different definition of 'prepare' and 'preparation' than that employed by the prosecutor, rendering her statements literally true… We face no such quandary here").[2] And, even if it was ambiguous, that ambiguity

---

[2] Indeed, under the Defendants' argument, many lines on a tax return could not be charged as false statements. For example, Line 12 refers to business income and references the attached Schedule C. By the Defendants' logic, even if the Schedule C is riddled with falsities, as long as

precludes the applicability of the literal truth defense. In either case, it was up to the jury to determine whether the Defendants understood that the tax return required honest reporting, including on the total income line. The evidence adduced at trial unequivocally supports the jury's finding that the Defendants knew that the returns did not report all the GEP clients' income.

The Government acknowledges, as it did during the trial, that a handful of Counts referenced the wrong line number. These Counts, however, still referenced the correct description, which was "total income," and they referenced the amount that was actually reported on the total income line for the corresponding tax return. The Court removed all references to the line numbers when delivering its instructions to the jury, and whether that was an improper amendment is addressed below.

## II.  <u>Variance</u>

When the Court, through its instruction to the jury, "broadens the bases for conviction beyond those charged in the indictment, a constructive amendment—sometimes referred to as a fatal variance—occurs." *United States v. Randall*, 171 F.3d 195, 203 (4th Cir. 1999) (citations omitted). A fatal variance occurs when "the indictment is altered 'to change the elements of the offense charged, such that the defendant is actually convicted of a crime other than that charged in the indictment.'" *Id.* (quoting *United States v. Schnabel*, 939 F.2d 197, 203 (4th Cir. 1991)).

---

the taxpayer blindly copies the profit amount from the Schedule C to Line 12, then that line would be a literally true copy and paste job. Of course, this logic fails, as a more reasonable interpretation of the Form is that Line 12 requires the taxpayer to report an accurate amount for his or her business income. *See United States v. Williams*, 683 Fed. Appx. 376, 380 (6th Cir. 2017) ("If an individual lies on a corporate tax return, he cannot copy that false information onto a personal return and claim it as 'literal truth.' Rather, the tax return would contain information known to be untrue").

Rule 52(a) of the Federal Rules of Criminal Procedure provides that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." Fed. R. Crim. P. 52(a). In this case, the Court redacted the line number references from the Indictment before providing a copy to the jury. It did so because the Indictment included some typographical errors. Specifically, in Counts 3, 6, 9, and 10, the Indictment cited the wrong line number from the tax returns. However, these Counts correctly identified the line description and the corresponding false amount. The decision to redact the line number references to avoid confusion was at worst a permissible variance, not an impermissible amendment.

A variance "occurs when the facts proven at trial support a finding that the defendant committed the indicted crime, but the circumstances alleged in the indictment to have formed the context of the defendant's actions differ in some way nonessential to the conclusion that the crime must have been committed." *United States v. Floresca*, 38 F.3d 706, 709 (4th Cir. 1994). "As long as the proof at trial does not add anything new or constitute a broadening of the charges, then minor discrepancies between the Government's charges and the facts proved at trial generally are permissible." *United States v. Fletcher*, 74 F.3d 49, 53 (4th Cir. 1996) (citations omitted). "Such a variance 'does not violate a defendant's constitutional rights unless it prejudices the defendant either by surprising him at trial and hindering the preparation of his defense, or by exposing him to the danger of a second prosecution for the same offense.'" *United States v. Whitfield*, 695 F.3d 288, 308 (4th Cir. 2012) (quoting *United States v. Ashley*, 606 F.3d 135, 141 (4th Cir. 2010)).

The Court's decision here is analogous to the facts in *United States v. Neff*, 525 F.2d 361, 363 (8th Cir.1975). In *Neff*, the indictment contained a description of the gun's serial number which had a numerical error. The Court held that "[c]orrection of a typographical error which goes to form rather than the substance of the indictment is permissible." *Id*. The correction of an

extra number corrected an obvious typographical error. "Such a variance goes to form and not to substance, and the difference did not reduce the government's burden of proof at trial." *United States v. Morrow*, 925 F.2d 779, 781-82 (4th Cir. 1991).

While the Indictment cited the wrong line number for Counts 3, 6, 9, and 10, the false item was specifically alleged as "total income" with an amount that directly correlated to the number reported on that specific line on the tax return. Moreover, to make their literal truth argument, the Defendants completely undercut their constructive amendment arguments by spending pages of their motions arguing that the total income line is literally true, clearly demonstrating that they were not without notice as to what the Indictment alleges. Overall, the Court corrected minor typographical errors when instructing the jury and redacting the line number references in the Indictment. Such minor corrections did not reduce the Government's burden at trial or unfairly surprise the Defendants. Indeed, given that Kohn was prepared to file a 32-page motion, filled with embedded images of tax returns showing the total income line, immediately upon the close of the Government's case, it is abundantly clear that he was very familiar with the charging language and the particular line alleged in the Indictment. The removal of a line number reference certainly does not amount to unfair surprise.

## III. Venue

The United States must prove venue by a preponderance of the evidence. *United States v. Engle*, 676 F.3d 405, 412 (4th Cir. 2012). In a tax prosecution under § 7206(1) or § 7206(2), venue "may lie not only where the return was made and subscribed, but also where filed, or where the preparer received information from the defendant even though the defendant signed and filed the returns elsewhere." *United States v. Rooney*, 866 F.2d 28, 31 (2d Cir. 1989) (internal quotation

marks and citation omitted); *United States v. Hirschfeld*, 964 F.2d 318, 321 (4th Cir. 1992); *United States v. Marrinson*, 832 F.2d 1465, 1474–75 (7th Cir.1987).

Kohn and Chollet argue that the Government failed to prove individual actions taken by them in the Western District of North Carolina. However, they miss the mark and ignore the Court's instruction to the jury about venue for the tax counts. The Court instructed the jury that it had to find that an act was committed by a defendant, *or caused to be committed*, in furtherance of the preparation or filing of the false tax return, including whether a tax return was signed in, filed in, or mailed from the Western District of North Carolina. The Court's instruction, which the Defendants do not contest in their motions, nor did they object to at trial, was appropriate as 26 U.S.C. § 7206(2) is a continuing offense. *See United States v. Pace*, 314 F.3d 344, 352 (9th Cir.2002) ("The act of making a tax return commences when one prepares and furnishes information material to the return and continues until that information is received by the IRS. For such continuing offenses, venue is proper in any district in which the continuing conduct has occurred").

Kohn and Chollet effectively used Simmons and Davis as their agents in collecting tax information from clients. Simmons' and Ms. Davis's actions taken in furtherance of the preparation of returns regularly occurred in the Western District of North Carolina. With the exception of Novak, the clients testified that they also gathered and sent their tax documents to Simmons and/or TKP from the Western District of North Carolina. Karen Bare testified that Kohn had access to her QuickBooks and would sometimes remote in and that Simmons and his office would assist her with communicating with TKP. *See also* GX 878. In 2020, Davis emailed Gregory and Nancy Bower with directions from Brennan to open a bank account and directed them how much money to run through it for the GEP. GX 989. Sean McGeehan, a TKP

41

employee, also emailed the Bowers on two occasions about reinstating their partnerships, a necessity for filing a partnership tax return. GX 986 and 987.

In another example, Kohn emailed Davis copying Simmons and Chollet, among others, requesting information for preparation of several GEP clients' tax returns. GX 1146. Kohn specifically said "I need to prepare the tax returns on all of the Yellow highlighted plans. In this regard, I need annual 2018 statements on all the policies we did for the insured in each plan." *Id.* A list of approximately 20 clients, many of whom testified at the trial, was attached. *Id.* at p. 2. Bower testified that he would email or send his tax information such as P&Ls, Income Statements, and other tax documents to Kohn for preparation of his tax returns. GX 993-1000.

For Novak, the only client who was not a resident of the Western District of North Carolina, the evidence established that venue was appropriate in the Western District of North Carolina because Davis again was treated as TKP's agent and Novak testified that he often worked through Simmons' office for tax-related matters with Kohn and Chollet. This was mostly because Kohn was notoriously dilatory at responding to clients. Another example of Simmons' office serving as an agent for TKP can be seen in an email from Novak to Davis where he provided her with a large number of tax returns on December 21, 2017. GX 943. This clearly exceeded Simmons' and his office's role as an insurance agent. The clients also testified that Davis facilitated the preparation of their tax returns on a yearly basis by gathering documents on their behalf or acting as a go-between for TKP. Overall, the jury had ample evidence to conclude that Kohn and Chollet caused an act in furtherance of the preparation of the returns at issue in Counts 2 through 12 in the Western District of North Carolina.

Regarding Simmons' returns, Kohn and Chollet again miss the mark. Although TKP prepared Simmons's returns in St. Louis, the jury saw and heard substantial evidence that

Simmons, through Davis, provided his books and records to TKP from his office in the Western District of North Carolina. Davis confirmed that she sent the information to TKP, and the jury saw emails from Davis sending his tax return information to TKP. GX 1110, 1111, 1131, 1133, 1140, 1147-1149, 1155, 1155A, 1189. Kohn and Chollet caused Simmons to knowingly provide them with information from the Western District of North Carolina so that they could prepare his 2015 through 2019 tax returns which contained fraudulent deductions and understated income. Accordingly, the United States established by a preponderance of the evidence that the Western District of North Carolina was a proper venue for the prosecution of the offense. *See United States v. Nealy*, 729 F.2d 961, 962–63 (4th Cir.1984) (upholding conviction under § 7206(2) of defendant who assisted in the preparation of a false engineering report which he knew would be used to compute unjustified deductions).

Although Simmons's 2015 through 2017 returns were mailed from Kohn's office, the jury also saw that Simmons and his wife hand-signed these returns. GX 206, 208, and 209. The jury could certainly reasonably conclude that Simmons and his wife signed the returns in the District where they lived and worked. This is especially true considering Kohn's signature date does not match the signature date for Simmons and his wife on the 2015 and 2016 returns. *Id*. To the extent it is possible that Simmons and his wife signed the returns on a trip to St. Louis, the signature dates would match. Given that they do not, the evidence circumstantially supports a much more reasonable conclusion that Simmons and his wife reviewed and signed the returns at their residence and then sent them to TKP.

It is true that Davis did not testify specifically that she was sitting at her desk at the insurance agency when she supplied the information to TKP. It is also true that there was no direct evidence of where Simmons was physically located when he signed his 2015 through 2017

43

returns. However, just like any other element of the offense, venue can be proven circumstantially. *United States v. Griley*, 814 F.2d 967, 973 (4th Cir. 1987). The jury could reasonably conclude that these actions took place in the Western District of North Carolina, where Simmons and Davis resided and worked. Taking the evidence in the light most favorable to the Government, and considering the lower standard of proof, the Court should deny the Defendants' motions based on lack of venue.

## IV. <u>Evidence of Kohn's 2002 Plea Agreement</u>

In his motion for a new trial, Kohn argues that the Court erroneously admitted evidence of his 2002 plea agreement. The parties extensively briefed this issue pretrial and there is no need to rehash it now. The Government did not introduce Kohn's previous plea agreement with the intent to prove he acted in conformity with a bad character. Rather, the lies he told to the clients about his plea agreement were highly probative of his intent, knowledge, and lack of mistake.

The Government incorporates its previous arguments about the admissibility of this evidence and supplements this argument to note two important considerations. First, it was Kohn who first introduced the subject of his previous conviction to the jury during his opening statement, not the Government, who refrained from any mention of the conviction in its opening statement. Given the Court's ruling that it would need to see how the clients testified before affirmatively admitting the evidence, Kohn chose to introduce the topic before its admissibility had even been decided. Second, the Court gave an appropriate limiting instruction to the jury on the proper and improper purposes in which it could consider the evidence. Specifically, on April 17, 2024, after the admission of the Stipulation, the Court instructed the jury as follows:

> So members of the jury this evidence is being offered because you've heard testimony, and maybe will again, that Mr. Kohn made certain statements or explanations regarding that prior conviction and then the stipulation of facts as to what actually happened in that

44

prior conviction. If you find that there is a difference between the explanations that he gave these witnesses and the stipulated facts, you may consider that -- those facts for the following purposes: Whether or not it tends to prove the defendant had a state of mind or the intent necessary to commit the crime charged -- crime or crimes charged in the indictment. To prove that the defendant knew what he was doing when he committed the crime charged in the indictment. Or to prove that the defendant did not commit the crime charged in the indictment by mistake or accident. However, and very importantly, do not conclude from this evidence that Mr. Kohn has bad character in general or that because he may have -- because he did commit similar acts, that he is more likely to have committed this crime with which he is currently charged. That is, you may not make any intuitive leap that because he pled guilty to a similar charge before, that he is more likely to have committed the charge with which he is now facing. That would be impermissible. But you may consider it for the purposes that I gave you.

This proper and thorough instruction mitigated any danger of unfair prejudice against Kohn. Thus, the Court should not grant his motion for a new trial. *See, e.g., United States v. Payton*, 302 F. App'x 225, 227–28 (4th Cir. 2008) ("the district court's limiting instruction to the jury, as well as the initial Rule 404(b) notice that was given to Payton by the Government, was sufficient to reduce any prejudicial effect the evidence may have had"); *United States v. McLean*, 182 F. App'x 165, 166 (4th Cir. 2006) ("After reviewing the record, we find the admitted evidence was no more sensational or disturbing than the charged crimes, and the manner of presentation of the evidence to the jury was neutral and did not appeal to the emotions of the jurors…. We note, moreover, that any prejudice was mitigated by the court's limiting instructions to the jury"); *United States v. Bunche*, 159 F. App'x 437, 439 (4th Cir. 2005) ("Where the trial judge has given

a limiting instruction on the use of evidence, the fear that the jury may improperly use the evidence subsides") (citing *United States v. Queen,* 132 F.3d 991, 997 (4th Cir.1997)).[3]

## V. Failure to State a Claim Against Simmons

Beyond his sufficiency of the evidence argument, Simmons rehashes an argument he made pursuant to his Motion to Dismiss the Indictment. Simmons argues that the Indictment was defective because it failed to state a claim against him. Doc. 212 at 8. The Court already denied this argument. *See* Doc. 95 at 14-17. Simmons provides no reason to revisit this decision. As such, the Court should deny his motion on this basis.

## VI. Government's Improper Change of Theory

Chollet argues that the Government improperly changed its theory mid-trial and that this change prevented her from mounting a defense.[4] Chollet's argument rests on numerous factual errors. The Government did not go "all in" on the theory that the GEP was illegal on its face. Chollet complains that the Government shifted its theory by arguing that TKP clients paid fictitious royalties, INFC did not sign partnership agreements for the GEP partnerships, and TKP prepared backdated documents to support prior year tax filings. Doc. 213 at 24. The problem with Chollet's argument is that the Government specifically alleged all these overt acts in the

---

[3] Chollet separately argues that the Court erred by admitting this evidence because it had a prejudicial effect on her as well. However, the Court made clear that the evidence could be considered against Kohn for certain limited reasons. Chollet's contention that the jury concluded the allegations from the previous conviction "were a family affair" is simply not credible or supported by the evidence or argument by any party at trial. Doc. 213 at 29. At no point did anyone argue that the previous conviction had anything to do with Chollet. Indeed, as she notes in her motion, she did not even graduate law school until 2010, eight years after Kohn's prior conviction. Doc. 213 at 12.

[4] Chollet notes multiple times that the Government's purported change in theory also "shifted the burden of proof." Doc. 213 at 23. The Government does not understand this contention as the burden of proof was always on the Government to prove her guilt beyond a reasonable doubt.

Indictment. *See, e.g.*, Doc. 1 at ¶¶ 2, 35, 49. Indeed, the second paragraph of the Indictment reads as follows:

> The GEP was designed to conceal clients' taxable income from the Internal Revenue Service ("IRS") by fraudulently inflating business expenses through fictitious royalties and management fees. These fictitious royalties and management fees were, on paper, "paid" to a limited partnership that was owned mostly by a charitable organization. In reality, KOHN and CHOLLET fabricated the fictitious royalties and management fees out of whole cloth.

Chollet was clearly on notice of the Government's theory of the case. The Indictment alleged that the expenses were fraudulent, that some partnerships did not even have bank accounts to receive the purported royalties, that INFC was not aware of some of the partnerships until it received Schedules K-1 listing it as a partner, and that TKP provided clients with backdated documents to support deductions for prior tax years. *See* Doc. 1 at ¶¶ 49-53, 55. As such, Chollet's contention that "the only way the prosecution could have proved that these royalty or management fees were fraudulent is if they proved that these companies had no value at all above and beyond their fixed assets" is simply wrong. Doc. 213 at 25. Beyond showing that some partnerships did not have bank accounts, and therefore could not have received a payment, the Government also showed that the GEP partnership tax returns did not list any valuable intangible property assets to justify royalty payments. The clients also testified that they had no idea how the royalty amounts were determined and did not discuss valuations with Kohn and Chollet. Furthermore, Ricketts testified that INFC never signed a partnership agreement with the numerous clients that testified at trial. Overall, the interests of justice do not require a new trial when the Indictment clearly put Chollet on notice of the Government's theory of the case.

## VII. <u>Failure to Instruct the Jury</u>

All three Defendants argue that they should be awarded a new trial because the Court failed to give a requested jury instruction. Kohn asked the Court to instruct the jury on the literal truth defense. Chollet asked the Court to instruct the jury on an authorization defense. Simmons asked the Court to instruct the jury on a reliance-on-counsel defense. The Court correctly refused these instructions, and as such, should deny their motions on these bases.

An appellate court reviews the refusal to give a jury instruction for abuse of discretion. The court's decision will be reversed only if the instruction was (1) correct; (2) was not substantially covered by the Court's charges to the jury; and (3) dealt with some point in the trial so important that the failure to give the instruction seriously impaired the defendant's ability to present a defense. *United States v. Hickman*, 626 F.3d 756, 771 (4th Cir. 2010). Importantly, the decision to not give the requested instruction is not viewed in isolation; rather, it is viewed in the context of all the Court's instruction. *Id.* Also, for an instruction to be correct, it must "(1) [have] an evidentiary foundation, *and* (2) accurately [state] the law." *United States v. Sloley*, 19 F.3d 149, 153 (4th Cir. 1994) (emphasis in original). An appellate court will "in general … defer to a district court's decision to withhold a defense in a proposed jury instruction in light of that court's superior position to evaluate evidence and formulate the jury instruction." *United States v. Powell*, 680 F.3d 350, 356 (4th Cir. 2012) (internal quotations omitted).

### A. Literal Truth Defense

Kohn's proposed literal truth defense instruction was a correct statement of the law. However, it did not have an evidentiary basis, as explained above. Regardless, even if Kohn satisfies the first prong, he fails the next two. The Court's other instructions not only covered the issue, but it did not deal with a point in the trial that was so important for Kohn's ability to present

48

a defense. Kohn was permitted to argue this point to the jury, and he did not raise the issue at any other point in the trial. Regardless, his argument was twofold, and he argued it to the jury during closing -- the returns could not be materially false because the total income line was mathematically correct and Kohn could not be found to have acted willfully if he did the math correctly.

The Court's other instructions addressed both of these arguments. The Court defined materiality for the jury and Kohn argued that the total income lines were correct. Consequently, Kohn was able to argue why the alleged falsities could not be material, an element of the statute charged. Similarly, the Court defined willfulness for the jury. The jury heard Kohn's arguments and could therefore weigh whether he acted willfully in entering a materially false number for total income line on the clients' returns.

Kohn's ability to present his defense was not seriously impaired by the Court's failure to give the literal truth instruction. Indeed, Kohn made this argument during his closing. Beyond that argument, there was no evidence presented on Kohn's belief that the total income line requires simple arithmetic or required an accurate reporting of a taxpayer-client's total income. The jury heard his argument and received the materiality and willfulness instructions, as noted above. As such, his ability to present a defense was not seriously impaired.

B.    **Authorization Defense**

Chollet's requested authorization defense fails all three prongs of the test. As an initial matter, the Government does not concede that her proposed instruction is an accurate statement of the law. Chollet cited military law for her proposed instruction and referenced the Pattern Jury Instructions for Federal Criminal Cases, District of South Carolina. Doc. 177 at pp. 42-43. However, Chollet's proposed instruction was a far cry from the pattern instruction. *See* Pattern

Jury Instructions for Federal Criminal Cases, District of South Carolina, p. 636.  Regardless, there was no evidentiary support for the instruction.  Chollet claims that there was evidence that she learned the GEP from Kohn and that he was her supervisor.  However, Chollet fails to point to any specific exhibits or testimony for this contention simply because there is none.  But even assuming Chollet learned the GEP from Kohn, the evidence was clear that she had her own mastery and understanding of the plan.  Chollet said as much in the undercover recordings, stating that she had already taken over the business and was ready to step in for her father's clients.  It was also clear that she had her own clients for whom she implemented and serviced the GEP and that she used the plan herself.[5]

Even if there was an evidentiary foundation for the instruction, the Court did not err because its other instructions covered this defense.  Namely, the Court's good faith instruction included the following language:

> The essence of the good-faith defense is that one who acts with honest intentions cannot be convicted of a crime requiring proof that the defendant acted willfully, that is, voluntarily and intentionally violating a known legal duty.

Chollet's argument is that she learned the GEP from Kohn and sincerely believed in it.  The good faith instruction completely encompasses this argument.  As such, Chollet cannot show either of the last two prongs of the test.

---

[5] Chollet's instruction begins with "you have heard evidence that a defendant followed instructions from a superior."  No such evidence was presented, so clearly the instruction was not warranted.  Chollet undermines her own point in her motion.  On one hand, she claims that she was an independent contractor and not a partner of TKP.  Doc. 213 at 13.  The Government does not concede this point, but it is ironic that she makes that claim but then also argues that the Court erred by not giving an instruction about her following the directions of a supervisor.

## C. Reliance-On-Counsel Defense

Simmons' requested instruction similarly fails on all three prongs of the test. Although Simmons' proposed reliance instruction was an accurate statement of the law, the Court correctly concluded that there was no evidentiary foundation to support the instruction. To properly assert the defense, Simmons had to show that he made a full disclosure of pertinent facts to an attorney and acted in good faith reliance on the attorney's advice. *Powell*, 680 F.3d at 356. There was no evidence presented at trial of what Simmons disclosed to his attorneys or whether he acted in accordance with their advice. As such, no jury instruction was warranted.

Notwithstanding the Court's pretrial ruling that Simmons could not assert reliance on counsel with respect to the marketing, promotion, and sale of the GEP, there was no evidence of what Simmons provided to Kohn and Chollet nor what advice they gave him about the GEP, if any. The reliance defense is simply inapplicable in this scenario. Rather, Simmons' actual argument is that he did not knowingly participate in the conspiracy because he thought the GEP was legitimate. In other words, he acted in good faith. And, as noted above, the Court gave a good faith instruction.

The Greenberg Traurig opinion letter was properly excluded from evidence and would not change this analysis regardless. Simmons attempted to introduce this letter through client witnesses and the Court appropriately sustained hearsay objections. Notably, Simmons does not even contest the Court's basis for excluding the letter. Instead, he simply asserts that its exclusion prohibited him from arguing a reliance defense. If Simmons wanted to introduce the letter for the effect it had on him, instead of for the truth of the matter asserted, he was free to take the stand and do so. He chose not to do that. Indeed, no other witness could testify as to what reliance Simmons placed on the letter, if any.

51

The letter is simply irrelevant for the purposes of a reliance defense for Simmons as well. Simmons provided no information to Greenberg Traurig, which makes sense because the letter was not written for Simmons. Indeed, Simmons did not have an attorney-client relationship with Greenberg Traurig and therefore received no advice from the firm to have relied on.

Simmons was permitted to present a reliance defense regarding his personal tax returns, but he failed to do so. The Government introduced evidence of documents Simmons (through Davis) provided to TKP for return preparation. However, there was no evidence of Simmons' purported good faith reliance on TKP. Again, Simmons was free to testify about his state of mind, but he chose not to. Without his testimony, or other evidence of his good faith reliance on TKP regarding false tax returns, there was no evidentiary basis for the Court to give a reliance-on-counsel instruction. *See Id.* at 357 ("Because of the dearth of evidence supporting the application of the advice-of-counsel defense, the district court denied the requested instruction")

## CONCLUSION

Taking the evidence in the light most favorable to the prosecution, and for the reasons set forth above, the jury's verdict should be upheld, and the Court should deny the Motions for Judgment of Acquittal. Similarly, for the reasons set forth above, there are no grounds for a new trial and the interests of justice do not require a new trial.

RESPECTFULLY SUBMITTED this 3rd day of July, 2024.

DENA J. KING
UNITED STATES ATTORNEY

By:    s/ Caryn Finley
       Caryn Finley
       Assistant United States Attorney
       New York Bar Number: 3953882
       United States Attorney's Office
       227 West Trade Street, Suite 1650
       Charlotte, NC 28202

52

(704) 344-6222 (office)
(704) 344-6629 (facsimile)
caryn.finley@usdoj.gov

/s Kevin Schneider
Kevin Schneider
Trial Attorney
United States Department of Justice
Tax Division
PA Bar ID: 318734
150 M Street, NE
Washington, D.C. 20002
(202) 616-3427
Kevin.schneider@usdoj.gov

/s Todd Ellinwood
Todd Ellinwood
Trial Attorney
United States Department of Justice
Tax Division
VA Bar ID: 45350
150 M Street, NE
Washington, D.C. 20002
Todd.a.ellinwood@usdoj.gov

## **CERTIFICATION**

Pursuant to the Standing Order of this Court entered June 18, 2024, and published to the

Bar of the Western District on June 27, 2024, the undersigned hereby certifies:

1.     No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2.     Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 3rd day of July, 2024.

s/ Caryn Finley
Caryn Finley
Assistant United States Attorney