# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### STATESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO.: 5:22-cr-60-KDB |
| | ) | |
| v. | ) | **UNITED STATES' SENTENCING** |
| | ) | **MEMORANDUM** |
| | ) | |
| MICHAEL ELLIOT KOHN | ) | |
| | ) | |

*"Pigs get fat.  Hogs get slaughtered.  So, be reasonable."*

**- Michael Kohn**

Defendant Michael Kohn, a serial fraudster who scammed the United States out of more than $22 million in taxes, was anything but reasonable.  Given the seriousness of Kohn's conduct, his history and characteristics, and the need for specific and general deterrence, the United States requests the Court impose a sentence of 168 months' imprisonment, the low-end of the Guidelines range.  Such a sentence is sufficient but not greater than necessary to accomplish the goals of sentencing and to provide just punishment to a serial, unapologetic tax cheat.  The Government further requests the Court order Kohn to pay restitution to the Internal Revenue Service in the amount of $22,515,615.

## I.      Procedural Background

On November 16, 2022, a federal grand jury in the Western District of North Carolina returned an Indictment against Kohn and his two co-conspirators, Catherine Elizabeth Chollet and David Shane Simmons, charging them with conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and multiple counts of aiding and assisting in the preparation of false tax

returns, in violation of 26 U.S.C. § 7206(2). Doc. 1. The Indictment further charged Simmons with multiple counts of filing materially false tax returns, in violation of 26 U.S.C. § 7206(1).[1] *Id*.

Trial began on April 15, 2024. The United States presented approximately seven days of evidence, called thirteen witnesses, and introduced well over 1,000 exhibits into evidence. The Defendants did not present any evidence and the case went to the jury on April 24, 2024. The jury returned its verdict on April 25, 2024, finding the Defendants guilty as to all counts in the Indictment. Doc. 202.

The Probation Officer issued the draft Presentence Report on July 8, 2024. Doc. 219. Kohn filed objections on July 22, 2024. Doc. 223. The Government had no objections to the report. On July 25, the Probation Officer issued the final PSR, noting Kohn's objections but concluding that the report was correct as written, minus a few typographical errors. Doc. 227.

## II. Factual Background

The PSR and the Government's response to the Defendants' motions for judgments of acquittal (Doc. 215) describe in detail the significant factual background of this case. The Government will not rehash the same 30 pages, but the following is a summary of the scheme and crucial facts. Kohn willfully executed a decade-long scheme to defraud the IRS. He was the leader of the conspiracy that involved filing hundreds of false tax returns all while profiting from substantial commissions earned by selling unnecessary life insurance policies. Unrepentant and unphased by his 2002 conviction for obstructing the IRS by designing paper transactions and creating fake deductions, Kohn returned to his old ways. Beginning as early as 2011, Kohn designed and peddled the Gain Elimination Plan ("GEP") to clients all over the country,

---

[1] The final count of the Indictment charged Kohn and Simmons with wire fraud, in violation of 18 U.S.C. § 1343, however, the United States moved to dismiss this count, which the Court granted on June 5, 2023. Docs. 60 and 61.

fraudulently reducing their taxes by taking fake deductions or simply allocating their income to a charity.

### A. Overview of the GEP

The Defendants marketed and implemented fraudulent GEPs for clients all over the country. The fraudulent tax shelter involved the creation of partnerships owned in large part by a charitable organization (the "GEP partnership"). The Kohn Partnership ("TKP") created the partnerships and some related corporate shell entities. After creating the partnership, the client transferred approximately a 98% limited partnership interest to a charity, almost always Inter-National Foundation Corporation ("INFC"). The plan called for the clients' legitimate businesses to "pay" the GEP partnership a royalty or management fee, thus reducing the real business's taxable income. The GEP partnership would then allocate 98% of its income to the non-taxed entity.

The movement of money did not match the allocations. The Defendants promoted the shelter by assuring their clients that they could use their money free of any encumbrances. Essentially, nothing would change in real life and all the tax magic would just happen on paper. The charity would continue to grow its partner capital account and would someday have to be made whole. The Defendants claimed that the shelter worked because the clients would purchase large life insurance policies on the life of the client and make the GEP partnership the beneficiary. When a client died, the GEP partnership would receive the funds and finally make good on the amount it owed to the charity (i.e., paying off the large capital account that grew each year by the amount of income allocated to the charity). So, the life insurance policies effectively collateralized the amount owed to the charity for years' worth of income allocations.

3

The Defendants, however, marketed the scheme as a 10-year plan. When some clients inquired about what would happen if they did not die in those ten years, or if they wanted to exit the plan before they died, the clients were assured that they could simply buy out the charity's partnership account at a discounted value, with this value of course being lower than the taxes saved throughout the plan. So, in effect, the Defendants were selling a tax shelter that promised tax deductions *now* in exchange for possible charitable donations in the future. And all it would cost the clients was an annual life insurance premium. When the clients were tired of paying the premiums, they could then cancel the policies and buyout the charity. The buyout amount would be less than the amount they saved in taxes and paid for insurance. Between that and the time value of money, the clients would profit substantially.

After creating the paper entity, the next step was acquiring large life insurance policies. Simmons, a licensed insurance agent, provided false information to the insurance companies to obtain the insurance. Given that the policies were often for multiple millions of dollars, the insurance companies wanted to know the purpose of the insurance. Despite knowing that the insurance was being purchased for the GEP and the policy amount was tied directly to the anticipated income to be eliminated, Simmons falsely informed the insurance companies that the policies were necessary for general estate planning and income replacement. Simmons prepared insurance applications that also often contained inflated income and net worth amounts, and he provided "introduction letters" that contained false information about his relationship with the client and the client's business history.

The next step was creating the tax deductions. The main driver of the tax savings were royalties/management fees that were simply made up. Kohn and Chollet, his law partner and daughter, drafted royalty agreements for their clients to sign, often providing only the signature

page of the document. The royalty agreements were vague, saying that the client's real business would pay a royalty to the GEP partnership for use of its intellectual property. That intellectual property was not more specifically defined, and the clients had no idea what it was referring to. The amount of the royalty was also not defined. Kohn and Chollet determined the amount of the royalty based on the desired income to eliminate. In the majority of cases, there was no contemporaneous movement of money and oftentimes the partnership did not even have a bank account. In the infrequent instances when money was transferred, the client could, and did, immediately transfer the funds back from the partnership or use the funds for their personal benefit.

The other way the Defendants fraudulently reduced income was by simply assigning the client's legitimate business income to the charity. Unbeknownst to the clients, the Kohn and Chollet prepared tax returns for their operating businesses that listed the charity as a majority owner. The tax effect of this was to assign nearly all the client's operating income to the charity. As shown during trial, at least two clients — Dr. Rose and Mr. Sullivan — were given only signature pages for these partnership agreements. These clients did not know that the signature pages would be appended to agreements that effectively gave away the right to nearly all the profits of their businesses. The clients never knew until years later when investigators interviewed them because, again, INFC never actually received any profits of their businesses.

The final step in the plan was, in theory, making the charity whole someday. This was not even possible for many of these fraudulent shelters because the charity often did not even know it was listed in a partnership agreement, which of course meant it was not actually a partner. INFC often did not know about the purported partnerships until it received a Schedule K-1 listing it as a partner. As INFC's outside counsel testified at trial, to this day, INFC has not signed a partnership agreement with many of the GEP partnerships at issue in this case. As such, the allocation of

income to INFC was simply fraudulent. Even when INFC did know of a GEP partnership, the partnership tax returns often reported significant cash distributions to INFC. INFC never received any of these reported distributions.

The GEP partnership tax returns also glaringly omitted something important – the purported valuable intangible assets that would justify the payment of royalties. The first page of the partnership tax returns often required the entity to report its total assets. The Schedule L, when required (and it was required for most of the GEP partnerships), represented the balance sheet of the entity. The partnership returns prepared and filed by Kohn and Chollet never reported a valuable intangible asset in any of these places.

Although the intangible assets were not real, the money the Defendants earned selling the GEP certainly was. Not only did selling these plans provide TKP with initial set-up fees and yearly tax return preparation and legal advice fees, but the Defendants also shared the substantial insurance commissions Simmons earned by selling the policies. Simmons sent roughly 50% of the insurance commissions to TKP, totaling approximately $1.2 million between 2014 and 2019. None of the Defendants told the clients that they were sharing these commissions, which is understandable as it represents a massive conflict of interest. Essentially, TKP was promoting a tax plan to clients without informing them that the firm stood to profit substantially off the sale of the insurance policies. Simmons also lied to the main insurance company by specifically telling it that he was not sharing his commissions with unlicensed individuals.

### B. Simmons's Personal Tax Returns

Similar to the client returns, TKP prepared fraudulent returns for Simmons. The returns failed to report substantial insurance income and significantly overreported legal and professional

fees. The jury found that these deductions were improper and resulted in false tax returns filed with the IRS.

### C. The Undercover Operation

The Defendants revealed their knowledge of the fraudulent nature of the GEP during a recorded undercover operation. Between multiple recorded phone calls and an in-person meeting in St. Louis, each Defendant made incriminating admissions. Simmons understood that the partnerships were not real. He said: "you don't have to have a second individual. It's just you're partners with yourself." Simmons also understood the importance of using INFC, as opposed to other charities. He said: "we've had some people that wanted to try to use their own charities, but, you know, that is kind of muddying the waters a little bit, because they want money like now."

Kohn's statements proved that he clearly understood that these plans were about one thing – fraudulently assigning income, but not cash, to a charity. When the undercover agent asked if income had to actually be distributed to the charity, Kohn said: "it doesn't have to go. It gets allocated. It's on paper. You don't transfer cash to the charity. You get the cash." When the undercover agent asked how much to allocate, Kohn said: "pigs get fat and hogs get slaughtered, so be reasonable." Kohn later clarified that "we're just basically borrowing their [the charity's] exemption." In terms of the mechanics, Kohn explained: "he'll pay the charity a royalty through the partnership, but the charity picks up the income. It does not get the cash."

Perhaps the most revealing conversation was about how the Defendants determined the amount of insurance necessary, and by extension, how much the yearly "royalty" would be. The undercover agent asked how Kohn and Simmons determined the amount of insurance to apply for. Kohn replied: "it's determined by how much he plans – that he wants to save." The undercover agent responded: "Got you. So whatever amount of tax savings and then you help him come up

with that amount?"  Simmons responded: "Yeah, yeah, yeah. Yes. So, under that scenario, if he's making – let's just say he's making a million a year.  Does he want to eliminate all of that, or does he want to do some of that or whatever?" The undercover agent then asked how much Kohn recommended eliminating if the income was $1 million.  In a laughing response, Kohn said: "a million."

Chollet revealed her understanding that the complexities of the plans were just window dressing, that she believed to be immune to IRS scrutiny.  During the undercover she explained that "the IRS never really comes in and has a global look at what you're doing."  She further said that "they're [the IRS] never going to see the moving pieces of the plan as a whole between different taxpayers."  The translation: this will look complicated enough on paper that the IRS will never unravel it.  Instead, at worst, the IRS will pick at low-hanging fruit on the outer edges.  Chollet also said that she used a GEP herself to the tune of $50,000 a year.

Overall, the Defendants caused a tax loss of over $22 million.  Simmons's false personal returns resulted in an additional tax loss of nearly half a million dollars.

III.    **Guidelines Calculation**

Although the Guidelines are advisory, sentencing courts "must consult those Guidelines and take them into account when sentencing."  *United States v. Booker*, 543 U.S. 220, 261 (2005).  Thus, at sentencing a court "must first calculate the Guidelines range." *Nelson v. United States*, 555 U.S. 350, 351 (2009).  The PSR calculated an offense level of 34, consisting of a base offense level of 26 for a tax loss greater than $9.5 million and less than $25 million, a 2-level enhancement for Kohn being in the business of preparing tax returns, a 2-level enhancement for sophisticated means, and a 4-level enhancement for Kohn's role in the offense as a leader of criminal activity that was extensive.  Kohn objected to the base offense level and many of the enhancements, as

discussed below. He did not object to the 2-level enhancement for being in the business of preparing tax returns.

The PSR calculated a Criminal History Category of II, based on Kohn's 2002 conviction for obstructing the IRS, which resulted in 2 Criminal History points. Kohn agrees that the criminal history calculation is currently correct, but he does note that the underlying conviction is currently the subject of a motion to expunge in the Eastern District of Missouri. The recommended Guidelines range for a final offense level of 34 and a Criminal History Category of II is 168-210 months. The Government asks the Court to overrule Kohn's objections to the PSR and adopt the findings and calculations of the PSR.

### A.    *Kohn's factual objections*

As a threshold matter, Kohn effectively objects to the inclusion of any facts in the PSR that were not presented at trial, seemingly ignoring the concept of relevant conduct. Using his own words, he "broadly objects to the offense and relevant conduct as described in Paragraphs 8 through 93" of the PSR. Doc. 223 at 2. He objects because this additional relevant conduct tax loss was based on statements and related documents for clients who did not testify at trial. He insists that "the only source of evidence now before this Court" is the testimony and exhibits from the trial. *Id.* at 4. Kohn ignores the law of relevant conduct, the evidence provided to him and the Court during the presentence investigation process, and the findings of the PSR. *See* 18 U.S.C. § 3661; U.S.S.G. § 1B1.3; *United States v. Whittington*, 395 F.Supp.2d 392, 395 (W.D.V.A. October 26, 2005) (U.S.S.G. 1.B1.3 clearly states "'*all* reasonably foreseeable acts and omissions' are to be included in the determination of the base offense level and adjustments"); U.S.S.G. § 6A1.3(a) (the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial); *United States v. Roberts*, 881 F.2d 95, 106 (4th Cir. 1989); *United*

*States v. Uwaeme*, 975 F.2d 1016, 1019 (4th Cir. 1992) ("[f]or sentencing purposes, hearsay alone can provide sufficiently reliable evidence of" material facts).

Kohn does not articulate any basis to challenge the factual assertions in the PSR, including those related to GEP clients who did not testify at the trial. Instead, he simply asserts broad objections to the inclusion of any facts beyond those presented at trial. The PSR includes detailed factual summaries of statements made by GEP clients and documents related to their plans, such as tax returns, insurance applications, and internal books and records. Some of these clients testified at trial while others were interviewed during the investigation.[2] Kohn does not make a single specific objection to any of these facts described over the course of 15 pages in the PSR. Doc. 227 ¶ 74.

Regarding the additional clients and tax loss reflected in the PSR, the witness statements and their documents confirm that their royalty GEP plans were bogus. A summary of the critical evidence related to these additional clients is described below. Crucially, this evidence is substantially similar to the evidence adduced at trial for the testifying clients.

- Client David Phillips (PSR ¶ 74(c))

    o INFC never signed a partnership agreement for Phillip's GEP partnership.

---

[2] Kohn argues that the Government included a "blanket summation of all Gain Elimination Plan tax savings as tax loss to the IRS" and that this inclusion was "improperly conclusory." Doc. 223 at 3. This is incorrect. The Government did not simply conclude that every GEP tax return was necessarily false (though it does not concede that any of them were accurate). Instead, the additional loss noted in the PSR relates to GEP clients who were interviewed during the investigation and made similar statements to those clients that testified at trial. Namely, that these additional clients did not have discussions with the Defendants about determining the amounts of royalties, they did not understand what IP they supposedly had, and at least some of them did not have bank accounts to receive purported royalty payments. Beyond that, their GEP entity returns similarly did not list valuable IP assets, their insurance applications contained false information, and the insurance was sometimes issued to the wrong entities. The Government did not interview every client who used the GEP over the years, nor did it include every client it did interview as part of its relevant conduct submission. As such, if anything, the proposed tax loss is a conservative estimate.

- o Phillips identified false information on his insurance applications, including inflated net worth amounts and a false valuation of his company.

- o Phillips did not know that INFC was listed as the 99% owner of his operating business.

- Clients Robert and Julie Mosby (PSR ¶ 74(i))

  - o The Mosbys did not know the name of the charity in their program. Their returns listed INFC.

  - o INFC did not sign a partnership agreement with their GEP partnership.

  - o The Mosbys did not have any intangible property that earned a royalty. They did not recall signing any royalty agreements nor did they have any discussions about royalties with Chollet.

- Clients Paul and Catherine Bennett (PSR ¶ 74(j))

  - o The Bennetts did not have any intangible property that earned a royalty, nor did they sign any royalty agreements.

  - o The Bennets did not know how TKP determined the royalty amounts. On two separate occasions, Paul Bennet asked Chollet and Kohn how they determined the royalty. Both times, Paul Bennett never got a response.

  - o The GEP partnership's tax return did not list a valuable IP asset on the balance sheet.

  - o INFC did not sign a partnership agreement with their GEP partnership.

- Client Andrew Miller (PSR ¶ 74(k))

  - o Miller did not understand how Kohn determined the royalty amounts.

- o Miller confirmed that no royalties were paid to his GEP partnership because the GEP partnership never had a bank account.

- o Miller's operating business never booked royalty expenses in its internal books and records.

- o The GEP partnership's tax returns did not list a valuable IP asset on the balance sheets.

- Client Matthew Macleod (PSR ¶ 74(l))

  - o Kohn determined the amount of the royalties, but nothing was actually paid because the GEP partnership did not have a bank account.

  - o Macleod identified an inflated net worth on his insurance applications.

- Client Brian Hickey (PSR ¶ 74(m))

  - o The cover letter for Hickey's insurance application was false. The explanations for the need for life insurance were not true.

  - o The $2 million royalty payment listed on Hickey's returns in 2017 was not possible because his GEP partnership never had a bank account.

  - o The GEP partnership's tax return did not list a valuable IP asset on the balance sheet.

- Client Yogesh Mittal (PSR ¶ 74(o))

  - o Mittal's GEP partnership did not have a bank account until 2020. TKP prepared and filed returns for Mittal for tax years 2017 and 2018 that reflected royalty payments to Mittal's GEP partnership.

  - o Almost all of Mittal's insurance ($29 million out of $30 million) was issued to an entity other than his GEP partnership.

- Clients Datis and Andrea Kharrazian (PSR ¶ 74(n))

  - The Kharrazians used a university for their GEP. They understood that the plan would allow them to support the university by making the university a partner in their businesses. They did not know that the university would be listed as a 98% owner.

  - The university did not provide any signed partnership agreements in response to a subpoena. According to email correspondence with the university, it had no records related to the Kharrazians's businesses.

  - The Forms 1065 listed the university as the general partner. The Kharrazians confirmed that the university had no say in running the business.

  - The Forms 1065 also listed distributions to the university. The Kharrazians said that they never distributed money to the university.

  - The Kharrazians did not obtain any life insurance policies for their businesses to implement their GEP.

These statements and documents confirm that the Defendants fraudulently reduced these clients' income by either deducting false royalties or fraudulently assigning income to a non-profit entity. Like the clients at trial, the non-profit entities often did not agree to be partners with these clients. The partnership tax returns also did not list valuable IP assets that would justify the payment of any royalties. Also, just like some clients at trial, many of these additional clients never opened bank accounts for their GEP partnerships.

Overall, the evidence established that the Defendants made up royalties and fraudulently assigned income to lower taxable income. The Defendants did not discuss valuing royalties or IP

13

with their clients because they never calculated such valuations. And there was no IP to value in the first place. In many cases, nothing was paid given that the entity purportedly receiving payment never had a bank account. Perhaps most basic of all, the non-profit "partner" in the GEP partnerships never agreed to be a partner. When considering this evidence as a whole, it is clear that the GEPs for all the clients described in the PSR were fraudulent.

The following table is found in the PSR at ¶ 61. It details the tax losses and return preparers. Kohn, along with his co-defendants, did not object (with any specificity) to these calculations or present alternative ones. The individual tax loss calculations resulting from removing the fraudulent royalties and income assignment are also attached as Exhibit I.

| | Taxpayer/Client | Tax Year | Tax Forms Prepared and Filed | Royalty, Mgt. Fee, or Ownership Structure | Preparer of Form 1040 | Tax Loss |
|---|---|---|---|---|---|---|
| a. | Matthew and Michelle Alepra | 2018 | 1120S, 1065, 1040 | Royalty | CHOLLET | $90,711 |
| b. | Matthew and Michelle Alepra | 2019 | 1065, 1040 | Royalty | CHOLLET | $11,093 |
| c. | Larry and Karen Bare | 2012 | 1120S, 1065, 1040 | Royalty | KOHN | $356,093 |
| d. | Larry and Karen Bare | 2013 | 1120S, 1065, 1040 | Management Fee | KOHN | $68,951 |
| e. | Larry and Karen Bare | 2014 | 1065, 1040 | NOL | Thompson | $21,790 |
| f. | Larry and Karen Bare | 2015 | 1120S, 1065, 1040 | NOL | KOHN | $18,192 |
| g. | Gregory and Nancy Bower | 2017 | 1120S, 1065, 1040 | Royalty | CHOLLET | $86,893 |
| h. | Gregory and Nancy Bower | 2018 | 1120S, 1065, 1040 | Royalty | CHOLLET | $21,600 |
| i. | Gregory and Nancy Bower | 2019 | 1120S, 1065, 1040SR | Royalty | KOHN | $90,033 |
| j. | Robert and Julia Mosby | 2015 | 1120S, 1065, 1040 | Royalty | CHOLLET | $13,258 |
| k. | Damian Novak | 2017 | 1120S, 1065, 1040 | Ownership Structure | KOHN | $802,801 |
| l. | Damian Novak | 2018 | 1120S, 1065, 1040 | Royalty and Ownership Structure | CHOLLET | $966,025 |

| | Taxpayer/Client | Tax Year | Tax Forms Prepared and Filed | Royalty, Mgt. Fee, or Ownership Structure | Preparer of Form 1040 | Tax Loss |
|---|---|---|---|---|---|---|
| m. | Damian and Melissa Novak | 2019 | 1120S, 1065, 1040 | Royalty and Ownership Structure | CHOLLET | $918,388 |
| n. | David and Mara Phillips | 2016 | 1065, 1040 | Ownership Structure | CHOLLET | $207,286 |
| o. | David and Mara Phillips | 2017 | 1065, 1040 | Ownership Structure | CHOLLET | $175,857 |
| p. | Gregory and Amy Rose | 2016 | 1065, 1040 | Ownership Structure | KOHN | $453,952 |
| q. | Gregory and Amy Rose | 2017 | 1065, 1040 | Ownership Structure | CHOLLET | $127,954 |
| s. | Jay and Colleen Snow | 2018 | 1065, 1040 | Royalty and Management Fee | CHOLLET | $500,014 |
| t. | Jay and Colleen Snow | 2019 | 1065, 1040 | Royalty and Management Fee | CHOLLET | $286,064 |
| u. | Craig and Sunnie Sullivan | 2017 | 1065, 1040 | Royalty | KOHN | $118,238 |
| v. | Craig and Sunnie Sullivan | 2018 | 1065, 1040 | Ownership Structure | CHOLLET | $18,925 |
| w. | Craig and Sunnie Sullivan | 2019 | 1065, 1040 | Ownership Structure | CHOLLET | $59,600 |
| x. | Paul and Catherine Bennett | 2016 | 1065, 1040 | Royalty | CHOLLET | $1,531 |
| y. | Paul and Catherine Bennett | 2017 | 1065, 1040 | Royalty | CHOLLET | $30,017 |
| z. | Paul and Catherine Bennett | 2018 | 1065, 1040 | Royalty | CHOLLET | $50,777 |
| aa. | Paul and Catherine Bennett | 2019 | 1065, 1040 | Royalty | CHOLLET | $157,208 |
| bb. | Brian and Joslin Hickey | 2017 | 1065, 1040 | Royalty and Ownership Structure | KOHN | $792,862 |
| cc. | Brian and Joslin Hickey | 2018 | 1065, 1040 | Ownership Structure | KOHN | $1,092,762 |
| dd. | Brian and Joslin Hickey | 2019 | 1065, 1040 | Ownership Structure | KOHN | $693,273 |
| ee. | Datis and Andrea Kharrazian | 2015 | 1065, 1040 | Ownership Structure | KOHN | $313,427 |
| ff. | Datis and Andrea Kharrazian | 2016 | 1065, 1040 | Ownership Structure | CHOLLET | $811,110 |

15

|  | Taxpayer/Client | Tax Year | Tax Forms Prepared and Filed | Royalty, Mgt. Fee, or Ownership Structure | Preparer of Form 1040 | Tax Loss |
|---|---|---|---|---|---|---|
| gg. | Datis and Andrea Kharrazian | 2017 | 1065, 1040 | Ownership Structure | KOHN | $601,928 |
| hh. | Datis and Andrea Kharrazian | 2018 | 1065, 1040 | Ownership Structure | CHOLLET | $452,202 |
| ii. | Datis and Andrea Kharrazian | 2019 | 1065, 1040 | Ownership Structure | CHOLLET | $894,845 |
| jj. | Matthew and Rachel Macleod | 2016 | 1065, 1040 | Royalty | KOHN | $343,455 |
| kk. | Matthew and Rachel Macleod | 2017 | 1065, 1040 | Royalty | KOHN | $510,301 |
| ll. | Matthew and Rachel Macleod | 2018 | 1065, 1040 | Royalty | CHOLLET | $885,050 |
| mm. | Matthew and Rachel Macleod | 2019 | 1065, 1040 | Royalty | CHOLLET | $1,191,398 |
| nn. | Andrew Miller | 2016 | 1065, 1040 | Royalty | KOHN | $344,306 |
| oo. | Andrew Miller | 2017 | 1065, 1040 | Royalty | KOHN | $507,058 |
| pp. | Andrew Miller | 2018 | 1065, 1040 | Royalty | CHOLLET | $903,560 |
| qq. | Andrew Miller | 2019 | 1065, 1040 | Royalty | CHOLLET | $1,146,366 |
| rr. | Yogesh and Mahala Mittal | 2017 | 1065, 1040 | Royalty | KOHN | $1,662,880 |
| ss. | Yogesh and Mahala Mittal | 2018 | 1065, 1040 | Royalty | CHOLLET | $1,814,563 |
| tt. | Yogesh and Mahala Mittal | 2019 | 1065, 1040 | Royalty | CHOLLET | $1,316,313 |
| uu. | Catherine and Todd Chollet | 2015 | 1065, 1040 | Royalty | CHOLLET | $13,962 |
| uu. | Catherine and Todd Chollet | 2016 | 1065, 1040 | Royalty | CHOLLET | $13,200 |
| vv. | Catherine and Todd Chollet | 2017 | 1065, 1040 | Royalty | CHOLLET | $3,612 |
| ww. | Catherine and Todd Chollet | 2018 | 1065, 1040 | Royalty | CHOLLET | $18,662 |
| xx. | Catherine and Todd Chollet | 2019 | 1065, 1040 | Royalty | CHOLLET | $52,765 |
|  | **TOTAL** |  |  |  |  | **$22,033,111** |

The Court is free to rely on the information contained in the PSR absent more specific and reliable objections. *See United States v. Terry*, 916 F.2d 157, 162 (4th Cir. 1990) ("Without an affirmative showing the information is inaccurate, the court is free to adopt the findings of the

presence report without more specific inquiry"). Indeed, according to Kohn's position of broadly objecting, the presentence investigation would be nearly meaningless, absent a calculation of a criminal history and a description of the defendant's background. The presentence investigation serves a much more meaningful purpose. Kohn bears the burden of showing that the information in the PSR is unreliable, and he has completely failed to carry that burden. *Id.* (the defendant has an "affirmative duty to make a showing that the information in the presentence report is unreliable, and articulate the reasons why the facts contained therein are untrue or inaccurate"); *see also United States v. Randall*, 171 F.3d 195, 210-11 (4th Cir. 1999) ("If the district court relies on information in the presentence report (PSR) in making findings, the defendant bears the burden of establishing that the information relied on by the district court in making its findings is incorrect; mere objections are insufficient").

The Defendants' mere disagreement with facts and conclusions in the PSR, without more, certainly does not call them into question. The Defendants continue to claim that the GEPs were not fraudulent – *i.e.*, that they are not guilty, so out of principal they object to additional loss from returns not presented at trial. Their position is of course fundamentally incompatible with the jury's verdict. Given the detailed findings in the PSR and Kohn's failure to even attempt to rebut them, the Court should adopt the reliable conclusions in the PSR. *See, e.g., United States v. Walker*, 2023 WL 4363655 at *3 (4th Cir. Jul. 6, 2023) ("the Government may rely on the PSR's factual findings without the need to put on additional evidence, unless the defendant affirmatively demonstrates that those findings are unreliable"); *United States v. Collins*, 721 Fed. Appx. 261, 262 (4th Cir. 2018) ("Collins' argument begins and ends with the naked assertion that the district court should not have relied on the PSR. Collins does not articulate any specific reason why a particular fact contained in the PSR is unreliable or untrue"); *United States v. Anderson*, 532 Fed.

Appx. 373, 379 (4th Cir. 2013) (in a case where the defendant challenged additional fraud loss not found by the jury, the court noted that "the government is not required to present evidence demonstrating the accuracy of facts in a PSR"). The Government therefore asks the Court to overrule Kohn's insufficiently broad objections.

As such, the Government asks the Court to adopt the findings of the PSR regarding relevant conduct tax loss of $17,566,401 and the total tax loss of $22,515,615.[3]

### B.        Sophisticated Means

Although acknowledging that the GEP is a sophisticated tax plan, Kohn objects to the sophisticated means enhancement because the GEP is not illegal on its face. Once again ignoring the jury's verdict and the evidence at trial, he argues that "applying the sophisticated means enhancement to a facially valid tax plan is improper." Doc. 223 at 4. The Sentencing Guidelines define sophisticated means as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2T1.4 Note 3. Contrary to Kohn's contentions, the enhancement is entirely proper in this case.

The tax fraud in this case goes far beyond typical or routine tax offenses. It involved the creation of limited partnerships that served no purpose other than facilitating tax fraud.[4] The Government presented evidence that the Defendants backdated documents, often sending just signature pages to clients. These clients testified that the Defendants did not explain the contents

---

[3] Kohn also objects to restitution in the amount of $22,515,615, instead insisting that it be no more than $4,466,710. He also insists that it can be ordered only as a condition of supervised release because this is a criminal tax case. Doc. 223, objection to ¶ 148. Both positions are wrong. As explained above, the total intended tax loss, including relevant conduct, was $22,515,615. The restitution not only can be ordered as part of the sentence, but contrary to Kohn's position, it must be ordered. The conspiracy conviction under 18 U.S.C. § 371 provides for mandatory restitution under 18 U.S.C. § 3663A.

[4] Some clients testified that asset protection was a consideration for their tax planning. However, these clients did not understand what assets were supposedly being protected nor did they understand that the Defendants were purportedly transferring valuable business IP to the limited partnerships. When asked what IP their businesses had, the clients could not say. As such, there were no assets in the limited partnerships to protect.

of the full documents to them.  For example, Greg Rose testified that no one explained to him that his partnership agreement included that he was transferring 98% of his operating business to INFC. All these false documents were designed to obfuscate and conceal the fraud.  *See United States v. Cesario*, 70 F. App'x 356, 358 (7th Cir. 2003) ("The cases also show that fabricating receipts, tax returns, business records, and other documents can be sophisticated methods of hiding tax fraud").

The scheme also relied on acquiring lucrative life insurance policies based on lies and concealment.  The Defendants lied about their sharing of commissions and did not tell the insurance company the true purpose of the life insurance.  These steps further concealed the fraudulent nature of the scheme and lowered the likelihood of its discovery.  *See United States v. Toto-Ngosso*, 407 F. App'x 687, 692 (4th Cir. 2011) ("the essence of the definition is merely deliberate steps taken to make the offense difficult to detect") (internal quotations omitted). Overall, the fraudulent tax shelter at issue here was certainly more complex than the average criminal tax case, and the Defendants took numerous steps to conceal the fraudulent nature of their scheme.

### C.  *Leadership Enhancement*

Kohn objects to the application of a 4-level role in the offense enhancement because the evidence does not prove that there were at least 5 criminally culpable participants in the scheme. Doc. 223 at 4-5.  Kohn does concede that a 2-level enhancement is appropriate, thus acknowledging his leadership role.  Kohn, however, ignores the alternative basis to apply the 4-level enhancement, which is that the criminal activity was "otherwise extensive."  U.S.S.G. § 3B1.1(a).  U.S.S.G. §3B1.1 Application Note 3 says: "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of

many outsiders could be considered extensive." Further, the Fourth Circuit has said that "in determining whether criminal activity is 'otherwise extensive,' many reviewing courts have examined the totality of the circumstances, including not only the number of participants but also the width, breadth, scope, complexity, and duration of the scheme." *United States v. Beverly*, 284 Fed. Appx. 36, 41-42 (4th Cir. 2008). When reviewing the totality of the circumstances, it is clear that the criminal activity was otherwise extensive.

The fraudulent scheme lasted over a decade. The scheme was complex in that it involved the creation of multiple entities, the filing of hundreds of tax returns, and the acquisition of sophisticated insurance products. Kohn also had clients across the country. Additionally, the success of the scheme relied on more than just the three Defendants. TKP employed multiple staff accountants and attorneys over the years who prepared initial drafts of tax returns. The attorneys also relied on administrative assistants, like Kay Taggert, who testified at trial. TKP additionally heavily relied on Brandi Davis, Simmons's office manager. Considering the totality of the circumstances, the 4-level enhancement is appropriate.

## III.    Section 3553(a) Factors

After calculating the Guidelines range, a sentencing court must then consider that range, as well as the sentencing factors set forth in 18 U.S.C. § 3553(a) and determine a sentence that is appropriate and reasonable for the individual defendant. *Nelson*, 555 U.S. at 351; *see also United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). The most relevant § 3553(a) factors here are the nature and circumstances of the offense and the need for the sentence to reflect the seriousness of the offense, the history and characteristics of the defendant, and the need for the sentence to provide adequate deterrence. § 3553(a)(1), (a)(2)(A), (a)(2)(B) (a)(2)(C). As explained below,

based on those factors, a sentence of 168 months, at the low end of the Guidelines range calculated in the PSR, is appropriate, necessary, and reasonable.

A.      *Nature, Circumstances, and Seriousness of the Offense*

The seriousness of the offenses here cannot be overstated.  For over a decade, Kohn marketed, sold, and implemented a fraudulent tax shelter that cost the Government over $22 million (conservatively) in tax revenue.  Although the plan looks complicated on paper —a feature, not a bug — the fraud boils down to two main points: taking fake royalty deductions and fraudulently assigning income to a charity.

The main cog in the tax fraud machine was a fake royalty.  The royalties were determined by how much income the Defendants wanted to eliminate, rather than any business reality.  A conversation from the undercover operation bears repeating.  The undercover agent asked how Kohn and Simmons determine the amount of insurance to apply for.  Kohn replied: "it's determined by how much he plans – that he wants to save."  The undercover agent responded: "Got you. *So whatever amount of tax savings and then you help him come up with that amount?*" Simmons responded: "Yeah, yeah, yeah. Yes. So, under that scenario, if he's making – let's just say he's making a million a year.  Does he want to eliminate all of that, or does he want to do some of that or whatever?"  The undercover agent then asked how much Kohn recommended eliminating if the income was $1 million. In a laughing response, Kohn said "a million."  The point of the conversation could not be clearer – the plan existed solely to fraudulently eliminate income. Everything revolved around how much income they wanted to eliminate.  Neither the royalty nor the insurance was driven by any sort of real business need.  The amounts were simply fabricated after they determined how much income to eliminate.

The problems with the royalties are even more fundamental than simply being made up. The royalties were not tied to a real business need because the intangible property they were supposedly paid for did not exist. It was a fiction. Indeed, the Defendants never articulated to the clients what the intangible property was. They had clients sign royalty agreements, some of which were backdated, that similarly did not define the intangible property. By refusing to define the intangible property, the Defendants could ostensibly sell the plan to anyone. This included Michelle Alepra, an emergency room physician. According to the Defendants' argument at trial, even she had some kind of intangible property that could make this plan work. At trial, the Defendants' attorneys sought to further their meritless position by asking questions about "personal brand" and "self-generated goodwill." Of course, this entire idea is nonsense and was unsupported by the evidence.

It is again worth revisiting the same conversation from the undercover operation. Not only is what's said important, but perhaps more important is what is *not* said. The Defendants have argued that the Government failed to prove that their valuations of the IP were unreasonable. The Government did one better – it proved that there was no intangible property or valuations. And this conversation is the proverbial smoking gun. When the undercover agent asked Kohn how much income he recommended eliminating if the client's income was $1 million, Kohn said $1 million. What Kohn did *not* say provided the jury and the Court insight into the true intentions of their plan. Kohn did not say it would depend on how much the client's IP was worth, or how much the client's business profited from using that IP for the year. Kohn did not ask any questions remotely geared toward valuing the client's "self-generated goodwill." He did not bother asking

any of those questions because they would be pointless. He knew all along that the number would be made up based on whatever amount of income they wanted to eliminate.[5]

If the royalty was real in any sense, Kohn could not possibly answer the undercover agent's question. But he did answer the question, and the answer was damning proof that he, and his co-Defendants, knew that royalties were not real. Essentially, Kohn said the quiet part out loud. If the client made $1 million, they would eliminate $1 million. The paperwork would fall into place later.

When the paper is put aside, the absurdity is clear. Taking Dr. Alepra again, the Defendants essentially sold her a shelter where she would pay an entity for the right to use her own name in her medical practice. In other words, she would pay a fictitious third party for the right to enter a patient's room and say "hi, I'm Dr. Alepra." The same absurdity is clear from Chollet's own plan. According to her, she was paying for the right to use her own name and business methods in carrying on her business of being a lawyer.

Each year, the Defendants prepared tax returns for the clients that fraudulently reduced their income by claiming these bogus royalties. The clients did not know how the royalty amounts were determined and they did not have royalty transactions reflected in their own business books and records. Worse, for some clients, the Defendants skipped the royalties altogether and fraudulently assigned a client's income to INFC by listing INFC as a partner in the client's operating business. The clients and INFC did not know this was happening, and the clients said

---

[5] An October 13, 2020, email from TKP client Paul Bennett is another shining example. Kohn explained to Bennett that TKP fired the first accountant who was working on his return and TKP had made some changes to significantly reduce Bennett's liability. Bennett responded: "I see that the main difference is the royalty amount changed from $218,000 to $500,000. I'm curious what changed to allow this number to increase and lower our liability." Exhibit A (USA-0010272). Bennett did not provide any email response from Kohn. Clearly, if the client did not know what changed, then he did not have any conversations with Kohn that could have impacted his valuation of the so-called goodwill. Also, Bennett clearly did not actually pay a $500,000 royalty, because if he did pay it, he would not be surprised by the amount.

that they would never knowingly give away large chunks of their businesses. Either way, the impact was the same – a fraudulent and significant reduction in the client's taxable income.

A separate but important consideration is the role of life insurance in the fraudulent shelter. The Defendants told their clients that they needed to obtain significant amounts of life insurance to collateralize amounts they would someday owe to INFC. Putting aside that the underlying transactions were fraudulent, considering that INFC often did not agree to be a partner in the GEP partnerships, no collateralization was needed. Either way, the true purpose of the insurance was to line the Defendants' pockets with the substantial commissions earned on the policies.

Compelling proof that the Defendants knew the life insurance was wholly unnecessary was demonstrated by the fact that the Alepras never obtained the insurance. Matthew Alepra testified that he had multiple conversations with Kohn and Chollet about not getting the insurance. He did not understand why his current insurance was insufficient, and, if he really had to get insurance, why he could not obtain the policy himself because he had an insurance license. Kohn and Chollet never gave him a satisfactory response, so the Alepras did nothing. Despite knowing that the Alepras did not obtain the insurance, the Defendants implemented the plan for them anyway. Their failure to respond made sense because once Mr. Alepra insisted on obtaining any policies himself, the financial motivation for the Defendants to insist on the policies disappeared.

To add the cherry to the top of their lucrative GEP smorgasbord, the Defendants worked together to prepare and file false personal tax returns for Simmons. It was not enough that they were making seven-figure insurance commissions, they decided to underreport Simmons's income by hundreds of thousands of dollars. Kohn even had the audacity to deduct the commission

splitting as legal expenses on Simmons's returns.[6]  This conduct alone would constitute a serious tax offense, causing a loss to the Government of over approximately half a million dollars.

Overall, the scheme was deliberate, expansive, and damaging.  Kohn acted with complete disregard for the law and was indifferent to the consequences of his actions.  The fraudulent tax returns caused a loss of over $22 million.  Some clients, such as the Sullivans and the Bowers, even paid more for the unnecessary life insurance than they saved (fraudulently) in taxes.  Other clients testified at trial about the difficulty they were having in unwinding the GEP or about the impact it had when they were trying to sell their business.  Also, at no point did Kohn explain to his clients that their plans were benefitting some third party's obligations under a settlement agreement in civil litigation involving a former client and INFC.  And, despite his self-proclaimed title of privilege protector, Kohn did not explain to his clients that he was sharing their privileged and confidential information, including their tax returns, with this third party.  Kohn's serious actions must be met with an equally serious sentence.

B.      *The Defendant's Personal History and Characteristics and the Need for Specific Deterrence*

Kohn is highly educated and intelligent, and as the clients testified at trial, given an opportunity, he will tell you how educated and intelligent he is.  He ran a successful law practice for over 30 years.  He clearly has the sophistication to understand the gravity of the choices he made and the seriousness of his crimes, especially because this is not his first time running afoul of the law.

---

[6] The Government did not argue at trial that the inflated legal fees were deducted commission splitting expenses. Instead, the testimony of Ms. Davis was that the amounts were higher than the books and records and she did not know of any additional legal fees.  It was Kohn who argued that the legal fees were the insurance commission splits.

1. <u>Kohn's History of Personal Tax Malfeasance</u>

Kohn has shown time and again that he is motivated by greed and has no remorse for his continued assault on the tax system. In *Kohn v. Commissioner*, T.C. Memo 2017-159 (2017), the United States Tax Court found that Kohn claimed a false casualty loss deduction on his 1992 tax return. The Tax Court agreed with the IRS's imposition of a significant fraud penalty. The Tax Court "[concluded] that Mr. Kohn fully expected the sale of the docks for $142,000 would soon be consummated when he signed the 1992 return claiming that the docks had become worthless in 1993." *Id.* at *46-47. Choosing its words carefully, the Tax Court further found " that Mr. Kohn intended to evade taxes known to be owing by signing a return that claimed a loss he knew was fictitious." *Id.* at *47.

Kohn also found himself in Tax Court over his failure to pay his substantial tax bill from 2001. *Kohn v. Commissioner*, T.C. Memo 2009-117 (2009). Kohn did not file his 2001 return until 2004. He reported tax due of $611,482, but he did not pay it. Kohn contested federal tax liens filed as a result of his unpaid taxes. He claimed that he paid $40,000 towards the taxes, but he could provide a copy of only the front of the check to the IRS, not the back. At trial in the Tax Court, Kohn provided no evidence of such a payment. In upholding the IRS's actions, the Tax Court noted that "Mr. Kohn is a well-educated and experienced tax attorney who is very familiar with the filing deadlines and payment obligations imposed by the Internal Revenue Code. *Petitioners did not file timely returns for any of the 10 years before 2001*." *Id.* at *5 (emphasis added).

Kohn's dedication to defrauding the IRS did not waiver after his losses in the Tax Court. The Government is not aware of the last time that Kohn paid *any* federal income tax. Despite operating a profitable law practice, Kohn somehow has a seemingly endless supply of net operating

26

losses ("NOLs") to wipe out his income each year. And, consistent with his pattern of behavior, these NOLs are fraudulent. For example, Kohn claimed a fraudulent $564,773 NOL on his 2018 Form 1040 that wiped out his taxable income. Exhibit B. Kohn claimed the NOL was attributable to losses he suffered in 2005. However, Kohn previously claimed a $20,074 NOL from 2005 on his 2015 Form 1040. Exhibit C (USA-00262871). The 2015 Form 1040 reported that he had only $5,301 of the 2005 NOL remaining to carry forward to future years. And, Kohn used that $5,301 on his 2016 amended Form 1040. Exhibit D (USA-00262903). So, *by his own account*, Kohn did not have any remaining NOL from 2005 after 2016. That did not stop him from claiming one for over $500,000 in 2018.

Kohn's hubris really shone through when he filed his 2017 Form 1040. As seen in Exhibit E, Kohn claimed yet another fraudulent NOL to offset *all* his income from that year. How do we know it is false? The claimed NOL was from 2001 – the same tax year that Kohn previously fought over in Tax Court after reporting a tax due of over $600,000. Kohn argued in Tax Court that the IRS failed to give him credit for payments on his 2001 tax debt. Nearly a decade after losing in the Tax Court, Kohn claimed on his 2017 tax return that he lost nearly $1 million in 2001 and he used this lie to wipe out his income.[7]

---

[7] Kohn did not limit himself to using false NOLs to commit tax fraud. On his original 2016 Form 1040, Kohn claimed a false Domestic Production Activities Deduction – the same false deduction that he and Chollet claimed on the undercover agent's amended returns. As can be seen in Exhibit J (USA-00262872), Kohn claimed a nearly $30,000 false deduction on his 2016 return (a return that Chollet prepared). The deduction utilized a business's gross receipts and employee wages for its calculation. Exhibit K (USA-00263498), TKP's 2016 Form 1065, confirms that the deduction on Kohn's personal return was being claimed for TKP's business. The deduction suffers from the same fraudulent flaw as the one claimed on the undercover agent's returns – it is applicable to domestic *production* (property that a business manufactures, produces, grows, or extracts in the United States). *See* Form 8903 instructions, available at https://www.irs.gov/pub/irs-pdf/i8903.pdf. There is simply no world where Kohn and Chollet, with their knowledge and experience, could have believed a law firm could have claimed this deduction. Although it is true that Kohn did not claim this false deduction on his amended 2016 Form 1040, he no longer needed to. The false NOLs wiped out all his income, so this bogus deduction was no longer beneficial.

27

## 2. Recidivism and Specific Deterrence

Kohn is a recidivist. One of the paramount factors that the Court must consider in imposing sentence under Section 3553(a) is the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). This includes not only general deterrence, but also the need to specifically deter the defendant from committing further offenses. In addition, Section 3553(a)(2)(C) also considers the need to protect the public from further crimes of the defendant. Kohn's actions thus far have given the Court every reason to believe that he will continue to peddle fraudulent tax shelters if he receives a lenient sentence.

Kohn of course is no stranger to criminal tax proceedings either, pleading guilty to obstructing the IRS in 2002, ultimately serving 6 months in prison. It is worth revisiting the facts from Kohn's first felony tax conviction. In his plea agreement, Kohn agreed that he "[devised] certain tax strategies which relied on fictitious transactions, placed form over substance, and lacked business purpose and economic substance, and which included multiple tiering of businesses, fictitious capital gains offsets, manipulation of fiscal years and the accruing of non-existent expenses." Kohn stands to be sentenced for peddling *another* fraudulent tax shelter that relied on fake transactions and the accruing of non-existent expenses. Clearly, Kohn's first run-in with the criminal justice system did not deter him.

Kohn will likely point out that his previous plea agreement contained language about his belief that some of his strategies were allowed under the Internal Revenue Code. However, this serves to only heighten the need for specific deterrence. Rather than learn from this experience, Kohn used his criminal history as a badge of honor in recruiting clients for this fraudulent shelter. Kohn lied about the facts of his previous case as well as his plea agreement. Again, showing absolutely no remorse, Kohn falsely claimed that the Government railroaded him and that he went

28

to prison to protect confidential client information. He falsely told clients that he was able to secure immunity for his previous clients. In other words, he was a hero and a martyr. None of it was true.[8] Coupled with his complete failure to accept responsibility in this case too, Kohn's attitude reveals that he will have no problem moving on to the next fraudulent shelter he cooks up. A meaningful sentence is required to send a strong enough message to finally put a stop to his enduring cycle of fraud.[9]

Kohn continues to deny any responsibility in this case, alleging to suffer from a number of medical problems, including mental health issues. But none of these problems explain or mitigate his continued disregard for the law. As noted, Kohn ran a successful law practice for over 30 years. His mental health problems did not stop him then. Simply put, greed and hubris motivated him here. The Court should sentence Kohn accordingly.

### C. General Deterrence

Although this is true of any case, the need for general deterrence is heightened with criminal tax prosecutions. Indeed, the Sentencing Commission specifically recognized this. *See* U.S.S.G. § 2T, introductory comment ("Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others form violating

---

[8] The Court should compare what Kohn told the Missouri Bar in applying for reinstatement versus what he said under oath during a deposition related to the INFC litigation. In the former, signed in November 2009, Kohn said: "What I ask of the Bar is simply to recognize that throughout this entire process I accepted absolute responsibility for my actions and any and all consequences thereof. At all times I acted with the highest level of professionalism." Exhibit F (USA-00499834). In the latter, taken in September 2012, Kohn denied any wrongdoing related to his first conviction and said he lied to the Court and admitted to something that he did not do. Kohn said in the deposition: "All of this is a fiction, and you stand in court, and the U.S. Attorney knows it's a fiction, and the judge knows it's a fiction, you know it's a fiction, and if it had said I was Jesus Christ, I'd have signed it. And if you think that you or anybody else is going to make me feel sorry for protecting my clients, the answer to that is no." Exhibit G.

[9] Kohn even openly acknowledged that his first conviction did not deter him at all. In one of his many emails to prospective clients where he lied about his previous conviction, Kohn told the client that he spent "another 2 years and $400,000 plus to 'clean up my name' but *by then I was back doing exactly what I was doing before*." Exhibit H (emphasis added).

the tax laws is a primary consideration underlying these guidelines"). The Fourth Circuit endorsed that reasoning in a tax evasion case, where it vacated a sentence of 18 months' home confinement:

> Given the nature and number of tax evasion offenses as compared to the relatively infrequent prosecution of those offenses, we believe that the Commission's focus on incarceration as a means of third-party deterrence is wise. The vast majority of such crimes go unpunished, if not undetected. Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path.

*United States v. Engle*, 592 F.3d 495, 502 (4th Cir. 2010).

The taxation system is a largely voluntary one, meaning that taxpayers are required to honestly self-assess and pay over the taxes that they owe. Criminal enforcement and strict penalties for violations are critical to protecting the integrity of this system. *See, e.g., United States v. Ture*, 450 F.3d 352, 357 (8th Cir. 2006) ("The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system"). The IRS's most recent study of tax compliance estimates that only 85% of taxes were voluntarily paid for 2022, leaving a projected tax gap of over $696 billion dollars in uncollected taxes. *See* IRS Publication 5869, "Tax Gap Projections for Tax Year 2022", October 2024, *available at* https://www.irs.gov/pub/irs-pdf/p58690.pdf. This voluntary system of compliance is undermined by lenient sentences because they cause would-be tax fraudsters to believe that they too will face light consequences.

Therefore, meaningful sentences must be given in tax fraud cases such as this to forewarn taxpayers of the serious consequences for engaging in multi-year tax fraud. "Studies have shown that salient examples of tax-enforcement actions against specific taxpayers, especially those that involve criminal sanctions, have a significant and positive deterrent effect." Joshua D. Blank, In Defense of Individual Tax Privacy, 61 Emory L.J. 265, 321 (2011). These studies and statistics show that a sentence of incarceration for tax fraud sends a strong message that non-compliance is serious.

The need for general deterrence is particularly important for tax crimes, which are lucrative, easy to perpetrate, and difficult to detect. *See States v. Zukerman*, 897 F.3d 423, 428 (2d Cir. 2018) (upholding above-Guidelines $10 million fine on 74-year old tax offender who received 70-month within-Guidelines prison term, and finding reasonable district court's rationale for upward variance based on vital need for deterrence to fight tax crimes); *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it").

A lenient sentence would fail to serve the goal of general deterrence. The message that such a lenient sentence would send to the community is that tax fraud will be tolerated and that those who engage in it will not be held accountable. Such a sentence would provide a taxpayer every incentive to perpetrate a tax fraud scheme—the reward is high, the chance of being caught and prosecuted is low, and the punishment in the unlikely event of a successful prosecution, is negligible. The Government respectfully submits that this is *not* the message that this Court should send to the public through its sentence of Kohn. The need for general deterrence, as specifically called for in 18 U.S.C. § 3553(a)(2)(B), demands more.

To put it simply, Kohn's sentence, like those of his co-Defendants, must send a message. Tax professionals are the gatekeepers of our voluntary tax system and those who abuse this system need to be severely punished to send a strong message to all. Professionals who design fraudulent tax shelters make a calculated decision that the worst cost of their fraud will be having their clients pay back the taxes. The sentence in this case should alter that calculus and send a clear message – this conduct will not be tolerated and will result in significant incarceration.

31

*D.*     *The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct*

Sentencing Kohn to 168 months in prison avoids unwarranted sentencing disparities and is consistent with the sentences of other attorneys and tax professionals who have marketed, promoted, sold, and financially benefitted from tax fraud schemes.

- On April 10, 2024, Michael L. Meyer was sentenced to eight years in prison following his guilty plea to conspiring to defraud the United States and tax evasion arising out of his promotion of an illegal tax shelter scheme involving false charitable deductions.[10]  (Southern District of Florida, 0:23cr60129).

- On January 9, 2024, Jack Fisher, a certified public accountant, and James Sinnott, an attorney, were sentenced to 25 years and 23 years in prison, respectively, following a jury trial where they were convicted for their organization, promotion and sale of abusive syndicated conservation easement tax shelters that caused more than $450 million in tax losses.[11] (Northern District of Georgia, 1:21cr231).

- On March 23, 2022, Iran V. Backstrom was sentenced to 105 months in prison and Mehef Bey was sentenced to 11 years in prison for conspiring to defraud the Untied States by promoting a nationwide tax fraud scheme to more than 200 participants in at least 19 states.  The scheme sought more than $64 million in tax refunds from the IRS.[12]  (Middle District of Florida, 6:21cr63).

- On June 25, 2014, Attorney Paul M. Daugerdas, following a jury trial, was sentenced to 15 years in prison for orchestrating a massive fraudulent tax shelter scheme that cause more than $1.6 billion in tax losses to the United States.[13] (Southern District of New York, 1:09cr581).

- On September 6, 2012, following a jury trial, William Scott Dion was sentenced to 84 months in prison for conspiring to defraud the United States and for obstructing

---

[10]   https://www.justice.gov/opa/pr/florida-attorney-sentenced-8-years-prison-fraudulent-charitable-contribution-tax-scheme

[11]     https://www.justice.gov/opa/pr/two-tax-shelter-promoters-sentenced-25-years-and-23-years-billion-dollar-syndicated

[12] https://www.justice.gov/opa/pr/two-promoters-nationwide-tax-scheme-sentenced-prison

[13]     https://www.justice.gov/opa/pr/former-jenkens-gilchrist-attorney-sentenced-15-years-prison-orchestrating-multibillion-dollar

32

the IRS. Dion and his co-defendants promoted an "under the table" payroll scheme.[14] (District of Massachusetts, 4:09cr40027).

- On October 27, 2010, Claudia Hirmer was sentenced to 20 years in prison and Mark Hirmer was sentenced to 15 years in prison following a jury trial. The Hirmers promoted a fraudulent tax and debt-elimination scheme.[15] (Northern District of Florida, 3:08cr79).

- On August 15, 2008, attorney Dennis Evanson, an attorney, was sentenced to 120 months in prison following a jury trial where he was convicted of conspiring to conceal portions of his clients' income from the IRS and creating false deductions for the purpose of reducing the income tax paid by his clients. Evanson's scheme involved more than $20 million in tax loss to the United States.[16] (District of Utah, 2:05cr805).

## IV. Conclusion

For the reasons stated, the Government requests this Court to impose a prison sentence of 168 months and order restitution to the IRS in the amount of $22,515,615.

RESPECTFULLY SUBMITTED this, 4th day of November, 2024.

<div style="margin-left:50%">

DENA J. KING
United States Attorney

DAVID A. HUBBERT
Deputy Assistant Attorney General
U.S. Department of Justice
Tax Division

By:    s/ Caryn Finley
Caryn Finley
Assistant United States Attorney
New York Bar Number: 3953882
United States Attorney's Office
227 West Trade Street, Suite 1650
Charlotte, NC 28202
(704) 344-6222 (office)
(704) 344-6629 (facsimile)

</div>

---

[14] https://www.justice.gov/opa/pr/massachusetts-tax-fraud-promoter-sentenced-prison-conspiracy-obstruct-and-impede-irs

[15] https://www.justice.gov/opa/pr/promoters-sham-tax-elimination-scheme-sentenced-tax-fraud-florida-1

[16] https://www.justice.gov/archive/tax/txdv08730.htm

caryn.finley@usdoj.gov

/s Kevin Schneider
Kevin Schneider
Trial Attorney
United States Department of Justice
Tax Division
PA Bar ID: 318734
150 M Street, NE
Washington, D.C. 20002
(202) 616-3427
Kevin.schneider@usdoj.gov

/s Todd Ellinwood
Todd Ellinwood
Trial Attorney
United States Department of Justice
Tax Division
VA Bar ID: 45350
150 M Street, NE
Washington, D.C. 20002
Todd.a.ellinwood@usdoj.gov

## <u>CERTIFICATION</u>

Pursuant to the Standing Order of this Court entered June 18, 2024, and published to the Bar of the Western District on June 27, 2024, the undersigned hereby certifies:

1.      No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2.      Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 4th day of November, 2024.